STATE of Wisconsin, Plaintiff-Appellant,

v.

Scott K. FISHER, Defendant-Respondent.

Supreme Court

*No. 2004AP2989–CR. Oral argument February 23, 2006.*
*—Decided May 17, 2006.*

2006 WI 44

(Also reported in 714 N.W.2d 495.)

124

For the plaintiff-appellant, the cause was argued by *Jeffrey J. Kassel,* assistant attorney general, with whom on the briefs was *Peggy A. Lautenschlager,* attorney general.

For the defendant-respondent, there was a brief by *Paul B. Millis* and *Skolos & Millis, S.C.,* Black River Falls, and oral argument by *Paul B. Millis.*

An amicus curiae brief was filed by *Daniel A. MacDonald* and *Mohs, MacDonald, Widder & Paradise,* Madison, on behalf of the National Rifle Association of America, Inc.

¶ 1. ANN WALSH BRADLEY, J. This case is before us on certification from the court of appeals. It presents the question of whether the respondent, Scott Fisher, can be prosecuted for carrying a concealed weapon in light of the right to keep and bear arms under Article I, Section 25 of the Wisconsin Constitution. Fisher was a tavern owner in Black River Falls who kept a loaded gun in the center console of his vehicle. At the time of his arrest, approximately 4:00 in the afternoon, he was on his way to McDonald's and was running personal errands.

¶ 2. Fisher moved to dismiss the criminal complaint against him, asserting that he kept the gun for security purposes because he routinely transported large amounts of cash generated by his business. The circuit court granted Fisher's motion and entered a judgment dismissing the complaint. The State appealed.

¶ 3. The State and Fisher dispute whether the concealed carry statute, Wis. Stat. § 941.23 (2003–04),[1] is constitutional as applied to him under this court's decisions in *State v. Cole,* 2003 WI 112, 264 Wis. 2d 520,

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

665 N.W.2d 328, and *State v. Hamdan,* 2003 WI 113, 264 Wis. 2d 433, 665 N.W.2d 785. Because we conclude that under those cases Article I, Section 25 does not bar Fisher's prosecution, we reverse the circuit court's judgment and remand for further proceedings.

I

¶ 4. In order to determine whether § 941.23 is unconstitutional as applied to Fisher, we must interpret and apply both the state constitution and statutory provisions. These are questions of law subject to independent appellate review. *Hamdan,* 264 Wis. 2d 433, ¶ 19; *see also Cole,* 264 Wis. 2d 520, ¶ 10.

¶ 5. In addressing the issue before us, we begin by summarizing this court's decisions in *Cole* and *Hamdan,* interpreting Article I, Section 25 in the face of constitutional challenges to § 941.23. We then turn to examine several pertinent principles established by those cases, using them to guide our analysis of the circumstances presented here. Ultimately, we conclude that § 941.23 is constitutional as applied to Fisher because his interest in exercising his right to keep and bear arms for purposes of security by carrying a concealed weapon in his vehicle does not substantially outweigh the state's interest in enforcing § 941.23.

II

A

¶ 6. Article I, Section 25 of the Wisconsin Constitution was adopted in November 1998. It reads as follows:

> The people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose.

126

Section 941.23, the statute prohibiting the carrying of a concealed weapon, predates the adoption of the amendment. It provides:

> Any person except a peace officer who goes armed with a concealed and dangerous weapon is guilty of a Class A misdemeanor.

¶ 7.   Three years ago, in *Cole* and *Hamdan,* this court had its first opportunity to address the constitutionality of § 941.23 in light of Article I, Section 25. In *Cole,* a case involving a concealed weapon carried in a vehicle, the court upheld the statute against both a facial and an as-applied constitutional challenge. In *Hamdan,* a case involving a concealed weapon carried inside a small family-run store, the court determined that the statute was unconstitutional as applied.

¶ 8.   We summarize each of these cases below. It is not our purpose to re-tread all of the constitutional ground that *Cole* and *Hamdan* covered. However, a somewhat detailed review of the cases is necessary to put Fisher's as-applied challenge in its proper context.

¶ 9.   In *Cole,* the court recognized that the right to keep and bear arms is not absolute. *Cole,* 264 Wis. 2d 520, ¶ 24. In addition, it determined that the test for the constitutionality of a regulation of that right depends on whether the regulation is a reasonable exercise of the state's inherent police power. *Id.,* ¶¶ 22–23, 26–27. This reasonableness test, the court explained, focuses on a balancing of the interests at stake:   the authority of the state to enact legislation for the health, safety, and welfare of the public as implemented in § 941.23 against the right to keep and bear arms under Article I, Section 25. *Id.,* ¶¶ 27–28.

¶ 10.  The court concluded in *Cole* that the statute is "a reasonable regulation on the time, place, and manner in which the right to bear arms may be exercised." *Id.*, ¶ 28. It said that the statute "does not unreasonably infringe upon a citizen's ability to exercise the right." *Id.* Indeed, the court noted, of all laws that regulate the time, place, or manner in which the right to keep and bear arms may be exercised, "[t]he CCW statute [§ 941.23] in particular serves an important public safety purpose." *Id.*, ¶ 43. Ultimately, the court held that § 941.23 was constitutional on its face. *Id.*, ¶ 44.

¶ 11.  The defendant in *Cole* also raised an as-applied challenge to § 941.23. *Id.*, ¶ 45. Although the court concluded that he had waived such a challenge, it nonetheless addressed his argument that the statute was unconstitutional as applied to his circumstances. *Id.*, ¶¶ 45–49.

¶ 12.  In *Cole,* the defendant was a passenger in a motor vehicle stopped by police. *Id.*, ¶ 3. The police found some marijuana in Cole's left breast pocket, a loaded .380 caliber pistol in the glove compartment, and a loaded .45 caliber semiautomatic pistol beneath the driver's seat. *Id.* Cole told police that he carried the .380 in the glove compartment for protection. *Id.* He was charged with a violation of § 941.23 but claimed that he was carrying weapons because he had been the victim of a brutal beating when he was younger and did not feel safe in the neighborhood. *Id.*, ¶¶ 1–4, 48. He did not assert that he had the weapons in response to any "specific or imminent threat." *Id.* In rejecting his argument, the court reasoned as follows:

> We do not dispute the legitimacy of Cole's reason for carrying the weapon. However interesting the debate about the right to self-defense by possession of a

weapon in a vehicle may be, such concerns are not implicated by the facts of this case. In *State v. Nollie,* 2002 WI 4, 249 Wis. 2d 538, 638 N.W.2d 280, a case arising after the passage of the right to bear arms amendment, this court confirmed that a person may claim self-defense when charged under the CCW statute. *Id.,* ¶¶ 18–19, 24, 26. However, in that case, we found that the unsubstantiated threat of four young men nearby, being loud and profane in a "high crime" area, was not "imminent and specific enough" for the defendant to invoke self-defense. *Id.,* ¶¶ 23–25.

*Cole,* 264 Wis. 2d 520, ¶ 48.

¶ 13. The court explained that "[t]he same problem [as in *Nollie*] arises in [Cole's] case" because he presented no evidence of any threat at or near the time he was arrested. *Id.* It determined that "[w]hatever the outer reaches of application of the CCW statute might be in light of the new constitutional amendment, [Cole's] fact scenario does not fall within them." *Id.,* ¶ 49.

¶ 14. In rejecting Cole's as-applied challenge, the court unequivocally held that "[t]he right to bear arms is clearly not rendered illusory by prohibiting an individual from keeping a loaded weapon hidden either in the glove compartment or under the front seat in a vehicle." *Id.* The court noted the danger of accidents involved in the transport of loaded weapons and noted that those dangers support restrictions on such weapons. *Id.*

¶ 15. On the same day the court decided *Cole,* it also decided *Hamdan.* In *Hamdan,* the court held that the concealed carry statute could not be constitutionally applied to the owner of a family-run grocery store who kept a loaded gun under the counter near the store cash register. *Hamdan,* 264 Wis. 2d 433, ¶¶ 1, 6–7,

129

81–82. The defendant in *Hamdan* had been in the process of putting the gun in storage for the night when police officers entered the store and eventually discovered that he had the gun in his trouser pocket. *Id.,* ¶¶ 1–3. Like the defendant in *Cole,* he was charged with carrying a concealed weapon under § 941.23. *Id.,* ¶ 4.

¶ 16.   The grocery store in *Hamdan* was located in a high-crime neighborhood in Milwaukee. *Id.,* ¶¶ 7–8. There had been at least three homicides, 24 robberies, and 28 aggravated batteries reported that year in the small census tract that included the store. *Id.,* ¶ 8. In addition, violent criminal episodes had occurred both inside and immediately outside the store. *Id.* During the six years leading up to Hamdan's offense, his store was the target of four armed robberies, three of which were successful, and two fatal shootings. *Id.,* ¶¶ 1, 8. On one occasion, an armed assailant held a gun to Hamdan's head and pulled the trigger, but the weapon misfired and Hamdan survived. *Id.,* ¶ 8. On another occasion, Hamdan had engaged in a struggle with an armed assailant who was attempting to rob the store and, in the course of this attack, shot and killed the robber in self-defense. *Id.* After Hamdan's prosecution, incidents of violent crime, including shootings that resulted in bullets striking the store, continued in and around the store. *Id.*

¶ 17.   The court in *Hamdan,* like the court in *Cole,* recognized that "the right to bear arms for lawful purposes is not an absolute." *Id.,* ¶ 40. "Article I, Section 25 does not establish an unfettered right to bear arms." *Id.,* ¶ 41. Likewise, the court recognized in *Hamdan,* as it had in *Cole,* that "Wisconsin's prohibition of the carrying of concealed weapons is, as a general matter, a reasonable exercise of police power." *Id.,* ¶ 53.

¶ 18. Further following the lead of *Cole,* the court in *Hamdan* applied a rule of reasonableness. *Id.,* ¶ 44. In order to effectuate the rule, it set forth the following framework for defendants who challenge on constitutional grounds a prosecution for carrying a concealed weapon. *Id.,* ¶ 86. Defendants have the burden of proof. They are required to secure affirmative answers to two questions before they can raise a constitutional defense:

> First, under the circumstances, did the defendant's interest in concealing the weapon to facilitate exercise of his or her right to keep and bear arms substantially outweigh the State's interest in enforcing the concealed weapons statute? The State generally has a significant interest in prohibiting the carrying of concealed weapons. Thus, to satisfy this element, the defendant must have been exercising the right to keep and bear arms under circumstances in which the need to do so was substantial. Second, did the defendant conceal his or her weapon because concealment was the only reasonable means under the circumstances to exercise his or her right to bear arms? Put differently, did the defendant lack a reasonable alternative to concealment, under the circumstances, to exercise his or her constitutional right to bear arms?

*Id.*[2]

¶ 19. Examining the first of the two questions, the court in *Hamdan* said that it was necessary to "balance the conflicting rights of an individual to keep

---

[2] If a defendant secures affirmative answers to these two questions, a third question remains: whether the State can show at trial that the defendant had an unlawful purpose at the time he or she carried the concealed weapon. *State v. Hamdan,* 2003 WI 113, ¶ 87, 264 Wis. 2d 433, 665 N.W.2d 785. Here, the State is not maintaining that Fisher was carrying a concealed weapon for an unlawful purpose.

and bear arms for lawful purposes against the authority of the State to exercise its police power to protect the health, safety, and welfare of its citizens." *Id.,* ¶ 45. It explained, "only if the public benefit in this exercise of the police power is substantially outweighed by an individual's need to conceal a weapon in the exercise of the right to bear arms will an otherwise valid restriction on that right be unconstitutional as applied." *Id.,* ¶ 46.

¶ 20.   The court also identified four objectives behind § 941.23:

(1) Carrying a concealed weapon permits a person to act violently on impulse, whether from anger or fear.

(2) People should be put on notice when they are dealing with an individual who is carrying a dangerous weapon. Notice permits other people, including law enforcement officers, to act accordingly.

(3) Related to the previous objective, concealed weapons facilitate the commission of crime by creating the appearance of normality and catching people off guard.

(4) Concealed carry laws promote the preservation of life by affixing a stigma of criminality to those who carry concealed weapons in cases except as those allowed by the statute. *Id.,* ¶¶ 54–56.

¶ 21.   Considering these objectives under the circumstances in *Hamdan,* the court was not persuaded that any of them were particularly compelling as applied to the defendant:

> Although a shopkeeper is not immune from acting on impulse, he or she is less likely to do so in a familiar setting in which the safety and satisfaction of customers is paramount and the liability for mistake is nearly certain. There is less need in these circumstances for

innocent customers or visitors to be notified that the owner of a business possesses a weapon. Anyone who enters a business premises, including a person with criminal intent, should presume that the owner possesses a weapon, even if the weapon is not visible. A shopkeeper is not likely to use a concealed weapon to facilitate his own crime of violence in his own store. The stigma of the law is inapplicable when the public expects a shopkeeper to possess a weapon for security.

*Id.,* ¶ 57.

¶ 22. The court in *Hamdan* relied on authority from numerous jurisdictions and repeatedly emphasized the special status of two locations for purposes of the right to keep and bear arms for security: one's home and one's privately-owned business. *See id.,* ¶¶ 58–68. The court determined that "a citizen's desire to exercise the right to keep and bear arms for purposes of security is at its apex when undertaken to secure one's home or privately owned business." *Id.,* ¶ 67. The court concluded, "[i]f the constitutional right to keep and bear arms for security is to mean anything, it must, as a general matter, permit a person to possess, carry, and sometimes conceal arms to maintain the security of his private residence or privately operated business, and to safely move and store weapons within these premises." *Id.,* ¶ 68. Conversely, explained the court, the state's interest in prohibiting concealed weapons is least compelling in those two locations. *Id.,* ¶ 67.

¶ 23. Focusing on Hamdan's particular circumstances, the court determined that his interest in concealing a weapon in his grocery store was substantial because his store was in a high-crime neighborhood; the store had been the site of past robberies and homicides; he had been a crime victim at the store; he had concerns not only for himself but also for his family and custom-

ers; and he had good reason to anticipate future crime problems at the store and a need to provide his own security to deal with the problems. *Id., ¶ 82.* The court concluded that Hamdan's substantial need to exercise his right outweighed the state's "negligible" interest in prohibiting Hamdan from concealing a weapon in his store at the time of his arrest. *Id.*

¶ 24.  In examining the second of the two questions, the court concluded that Hamdan had no reasonable means of keeping and handling the weapon in his store except to conceal it. *Id., ¶ 83.* The court explained that it would have been dangerous and counterproductive to openly display the weapon during business hours, and that requiring him to do so would have seriously impaired his right to bear arms for security. *Id.* Carrying the handgun openly in the store would have shocked his customers, seriously threatened his safety, and was not a reasonable option. *Id.*

### B

¶ 25.  *Cole* and *Hamdan* must be read together to resolve the as-applied constitutional challenge to § 941.23 that is before us.[3] Those cases establish several principles that inform our analysis.

¶ 26.  First, the *Hamdan* test applies whenever a defendant asserts that § 941.23 is unconstitutional as applied. In other words, the *Hamdan* test is not limited

---

[3] Before continuing with our analysis of the issue—Fisher's as-applied challenge to Wis. Stat. § 941.23—we pause to note that at the end of his oral argument, Fisher switched gears from the arguments made in his brief and asserted a facial challenge to the constitutionality of the statute. This court squarely addressed and rejected a facial challenge to § 941.23 in *State v. Cole,* 2003 WI 112, 264 Wis. 2d 520, 665 N.W.2d 328. We see no reason today to revisit and overrule *Cole* only three years later.

to challenges to prosecutions for carrying a concealed weapon in one's home or privately-owned business. When summarizing the test, the court set forth the requirements for "[a] defendant who challenges on constitutional grounds a prosecution for carrying a concealed weapon." *Hamdan,* 264 Wis. 2d 433, ¶ 86.

¶ 27.  Second, the court in *Hamdan* recognized that there are two places in which a citizen's desire to exercise the right to keep and bear arms for purposes of security is at its apex:   in the citizen's home or in his or her privately-owned business. *Id.,* ¶ 67. Thus, it logically and necessarily follows that the individual's interest in the right to bear arms for purposes of security will not, as a general matter, be particularly strong outside those two locations.

¶ 28.  Third, in a similar vein, under both *Hamdan* and *Cole* an individual generally has no heightened interest in his or her right to bear arms for security while in a vehicle. This principle follows from *Hamdan's* repeated focus on the heightened interest in that right in the individual's home or privately-owned business. It is even more emphatically dictated by *Cole,* in which the court unequivocally held that "[t]he right to bear arms is clearly not rendered illusory by prohibiting an individual from keeping a loaded weapon hidden either in the glove compartment or under the front seat in a vehicle." *Cole,* 264 Wis. 2d 520, ¶ 49.

¶ 29.  Fourth, while the state's interest in prohibiting the carrying of concealed weapons may generally be at its weakest in an individual's home or privately-owned business, *Hamdan,* 264 Wis. 2d 433, ¶ 67, the

135

state's interest will generally be strong when a concealed weapon is being carried in a vehicle. The objectives behind the concealed carry statute as identified in *Hamdan* include that carrying a concealed weapon allows individuals to more easily act violently on impulse. *Id.,* ¶ 54. Those objectives also include that other individuals, including law enforcement officers, should be placed on notice when they are dealing with someone who is carrying a dangerous weapon, along with the related concern that concealed weapons facilitate the commission of crime by creating the appearance of normality and catching people off guard. *Id.,* ¶ 55. The court in *Hamdan* said that this notice objective is "perhaps the most significant." *Id.*

¶ 30. These objectives are highly salient when an individual carries a concealed weapon in a motor vehicle. Of particular concern is the potential danger to law enforcement officers if an individual is carrying a concealed weapon during the course of a traffic stop. Given the frequency of contacts between law enforcement and motorists, individuals carrying concealed weapons in motor vehicles present a greater overall risk to law enforcement than do individuals carrying concealed weapons in their homes or privately-owned businesses.

¶ 31. The carrying of loaded weapons in a motor vehicle also presents an additional risk of accident. *Cole,* 264 Wis. 2d 520, ¶ 49. The court in *Cole* recognized this risk as a consideration when analyzing Cole's as-applied challenge to the constitutionality of the concealed carry statute in the vehicle context. *Id.* The legislature has recognized a similar safety concern by generally prohibiting the transport of any firearm in a

136

vehicle unless it is unloaded and encased. Wis. Stat. § 167.31(2)(b).[4]

■

¶ 32. Fifth, because the individual's interest in carrying a concealed weapon in a vehicle is generally comparatively weak and the state's interest in prohibiting such weapons in vehicles is relatively strong, it is only in extraordinary circumstances that an individual asserting a constitutional defense under *Hamdan* will be able to secure an affirmative answer to the first question in the *Hamdan* test. Stated another way, only in extraordinary circumstances will an individual carrying a concealed weapon in a vehicle be able to demonstrate that his or her interest in the right to keep and bear arms for security substantially outweighs the state's interest in prohibiting that individual from carrying a concealed weapon in his or her motor vehicle. If a defendant reasonably believes that he or she is actually confronted with a threat of bodily harm or death and that carrying a concealed weapon is necessary for protection from the threat, extraordinary circumstances would be present. Absent such circumstances, an individual carrying a concealed weapon in a vehicle will generally be unable to demonstrate that his or her interest in the right to keep and bear arms for

---

[4] Wisconsin Stat. § 167.31(2)(b) provides that, subject to various exceptions, "no person may place, possess, or transport a firearm . . . in or on a vehicle, unless the firearm is unloaded and encased . . . ." Under § 167.31(1)(b), "encased" means "enclosed in a case that is expressly made for the purpose of containing a firearm and that is completely zipped, snapped, buckled, tied or otherwise fastened with no part of the firearm exposed." A person who violates § 167.31(2)(b) is subject to a forfeiture of up to $100 under § 167.31(2)(e).

security substantially outweighs the state's interest in prohibiting that individual from carrying a concealed weapon in a motor vehicle.

¶ 33. By requiring extraordinary circumstances, we strike the proper balance between an individual's comparatively weak interest in carrying a concealed weapon in a vehicle and the state's strong interest in prohibiting such weapons in vehicles. To do otherwise would constitute a significant retreat from *Cole*. It would also render largely superfluous the court's repeated emphasis on homes and privately-owned businesses in *Hamdan*.

¶ 34. With these principles in mind, we turn to the specific circumstances here. We rely on facts primarily from Fisher's testimony at the hearing on his motion to dismiss. Additional facts come from the criminal complaint against Fisher.

■

¶ 35. At the time of his arrest, Fisher was the owner and operator of a tavern in Black River Falls, Wisconsin. He often had large sums of cash on hand at the end of a night's business. He would leave some cash in the tavern's safe for business the next day and on most nights, usually four or five times a week, he would take the remaining cash with him. On some nights, he would take the money directly to the bank to deposit it, and on other nights he would take it home to deposit the next day.

¶ 36. Given the unpredictability of the business, Fisher would not always know in advance whether he would be transporting cash after closing the tavern. Because it did not seem practical to remove the weapon when he was not transporting cash for the business, he kept the gun in his vehicle even at times when he was

not transporting cash. Fisher kept the gun loaded, with the safety on, in the vehicle's console. He never brought the gun into the tavern.[5]

¶ 37.   Fisher considered himself at risk because he transported cash from his business to the bank or his home. Although he had never been robbed, he knew of an incident in Whitehall where a bartender's throat was cut by somebody walking out of the bar. He also knew of four businesses that had been robbed, some at gunpoint, in the last year or so in Black River Falls.

¶ 38.   Approximately one-and-one-half weeks before Fisher's arrest, someone had stolen his vehicle outside his tavern after he left it running to warm up in the cold at 2:45 a.m. When he called the police to inform them of the theft, he notified them that his vehicle contained a loaded gun. The vehicle was recovered, and Fisher received a citation in the mail for transporting loaded firearms. The firearms that were in the vehicle at the time it was stolen included a .40 caliber handgun, a shotgun, a .22 caliber rifle, and a .22 caliber pistol. Three of these firearms were loaded.

¶ 39.   On the day of Fisher's arrest, at approximately 4:00 in the afternoon, he stopped at a Department of Natural Resources office in Black River Falls to discuss the citation. He was on his way to McDonald's and was running other personal errands. During the course of Fisher's discussion with a warden, he told the warden that he had a loaded handgun in his vehicle at that time. The warden seized the firearm, which was a .40 caliber semiautomatic handgun located in the center console of the front seat. It had nine rounds in its

---

[5] Under Wis. Stat. § 941.237(3)(d), tavern licensees, owners, and certain of their agents are exempted from the general statutory prohibition on possessing a handgun on the tavern premises. *See also generally* § 941.237.

magazine and an additional round chambered. The warden also seized another loaded magazine, a box of .40 caliber ammunition, and an unidentified cartridge, all of which were next to the gun in the center console.

¶ 40.   When we consider these facts, we determine that they do not show that Fisher demonstrated a substantial need to exercise his right to keep and bear arms for security purposes by carrying a concealed weapon in his vehicle. A comparison of some of the key facts of *Hamdan* to the key facts in this case is illustrative.

¶ 41.   The defendant in *Hamdan* owned and operated a grocery and liquor store that was located in a high-crime neighborhood in Milwaukee. *Hamdan,* 264 Wis. 2d 433, ¶¶ 7–8. There had been at least three homicides, 24 robberies, and 28 aggravated batteries reported that year in the small census tract that included Hamdan's store. *Id.,* ¶ 8. Fisher's tavern, in contrast, cannot realistically be considered to be situated in a high-crime neighborhood. He testified that he knew of four businesses that had been robbed, some at gunpoint, in the last year or so in Black River Falls. The State has countered this evidence with publicly-available FBI crime statistics showing that crime rates in Black River Falls (population 6,225, according to the FBI statistics) do not differ significantly from rates in other areas of similar populations.[6] We are not per-

_____

[6] These statistics show that in the year in which Fisher was arrested, there were a total of six violent crimes in Black River Falls reported by law enforcement, including one robbery. This is not necessarily inconsistent with Fisher's testimony, and we are not suggesting that Fisher's testimony was false. The circuit court found Fisher to be a credible witness, and we take all of his testimony at his motion hearing to be true for purposes of this appeal.

suaded that Fisher can reasonably characterize Black River Falls at the time of his arrest as a high-crime area. Such a characterization would erase any meaningful distinction between a truly high-crime area and any other area.

¶ 42. In *Hamdan,* violent criminal episodes had occurred both inside and immediately outside Hamdan's store. *Id.* During the six years leading up to his offense, Hamdan's store was the target of four armed robberies, three of which were successful, and two fatal shootings. *Id.,* ¶¶ 1, 8. Here, there is no evidence in the record that in the approximately five years Fisher had owned the tavern it was ever the site of an armed robbery, a fatal shooting, or any other violent criminal episodes.

¶ 43. Less than three years before his offense, Hamdan had been attacked by an armed assailant who held a gun to his head and pulled the trigger, although the weapon misfired and Hamdan survived. *Id.,* ¶¶ 1, 8. At one point, Hamdan had engaged in a struggle with another armed assailant who was attempting to rob the store and, in the course of this attack, shot and killed the robber in self-defense. *Id.,* ¶ 8. Here, in contrast, Fisher had never been robbed, and there was no evidence that he had ever been a victim of a crime, other than when his vehicle was stolen.

¶ 44. In short, a comparison of key facts in *Hamdan* to key facts in this case illustrates major weaknesses in Fisher's claim that he had a substantial interest in exercising his right to keep and bear arms for security purposes. Although a defendant may not need to establish facts exactly like those in *Hamdan* in order to demonstrate such a substantial interest, Fisher's circumstances are a far cry from Hamdan's.

141

¶ 45. In addition, we perceive a dissonance between certain facts in this case and Fisher's asserted concern for his security under the circumstances. Presumably, one of the times that Fisher would have been most vulnerable was when he was closing his tavern for the night or when he was transporting cash from the tavern to his vehicle. Nothing in his testimony suggested that he kept a concealed weapon with him when moving between the tavern and his vehicle. Also relevant to Fisher's asserted interest in security is that only one-and-one-half weeks before his arrest, he was willing to leave three loaded firearms in his running, unlocked vehicle unattended outside his tavern at 2:45 a.m.

¶ 46. All of these circumstances go to the reasonableness of Fisher's claim that he had a need to exercise his right to keep and bear arms for security purposes that justified carrying a concealed weapon in his vehicle. The incident in which his car was stolen while it contained three loaded firearms also underscores that the state's interest in prohibiting Fisher from carrying a concealed weapon in his vehicle was eminently reasonable.[7]

¶ 47. Fisher also argues there was no evidence suggesting he was prone to act irresponsibly or impulsively in the use of a weapon. He also notes that he had

---

[7] We recognize that the fact that Fisher's car was stolen is one of the circumstances on which he relies in asserting a substantial interest in carrying a concealed weapon for security. This fact, however, cuts both ways. Although Fisher's charge is not for his conduct on the night his vehicle was stolen, that conduct is relevant both to the reasonableness of his asserted interest in carrying a concealed weapon for security purposes at the time of his arrest and to the reasonableness of the state's interest in prohibiting him from carrying a concealed weapon in his vehicle at the time of his arrest.

142

training in the use of firearms and the use of force. Fisher further argues that he is a law-abiding citizen with no history of criminal conduct. We do not find these arguments convincing. None of those facts significantly diminishes the state's strong interest in enforcing § 941.23 in the motor vehicle context, which, by its very nature, presents a greater risk of harm than would be present in an individual's home or privately-owed business.

¶ 48.   In sum, Fisher failed to meet his burden of proof to secure an affirmative answer to the question of whether his interest in concealing a weapon to facilitate the exercise of his right to keep and bear arms substantially outweighed the state's interest in enforcing § 941.23. The facts here amount to far less than a showing that he had any significant interest in exercising his right to keep and bear arms for security purposes by carrying a concealed weapon in his vehicle. At the time of his arrest, it was 4:00 in the afternoon in Black River Falls, and he was engaged in personal errands and on his way to McDonald's. Not only was he carrying a concealed weapon in a location that is not one of the "apex" locations identified in *Hamdan,* but also the other specific circumstances of his case are not particularly compelling.

¶ 49.   Although the facts presented might be taken to suggest that Fisher had more than an average citizen's interest in exercising his right to keep and bear arms for purposes of security, on balance his circumstances do not come close to substantially outweighing the state's strong interest in prohibiting the carrying of a concealed weapon in a motor vehicle. He could not have reasonably believed that he was actually confronted with a threat of bodily harm or death. Therefore, he also could not have reasonably believed that

carrying a concealed weapon was necessary for protection from such a threat. Fisher's case does not present the type of extraordinary circumstances that could justify the carrying of a concealed weapon in a motor vehicle.

¶ 50. Fisher makes two additional arguments that, while somewhat tailored to the facts of his case, are in many ways categorical. Both arguments go to the constitutionality of § 941.23 more generally, not just as applied to his particular circumstances. These arguments are that (1) recent legislative action demonstrates the legislature's intent that § 941.23 may be unconstitutional, and (2) his vehicle is an extension of his business. We address each argument in turn.

¶ 51. We begin with Fisher's argument based on recent legislative action. Fisher asserted at oral argument that we should consider in our analysis the legislature's recent unsuccessful attempts to create a licensing system for carrying a concealed weapon and to amend § 941.23. According to Fisher, this shows the legislature's belief that there should not be such a broad rule prohibiting the carrying of concealed weapons and that such a broad rule is perhaps unconstitutional. For at least two reasons, we disagree that the legislature's recent attempts to create a licensing system and to amend § 941.23 can be taken as a signal that the statute is unconstitutional.

¶ 52. First, in *Cole,* the court already put to rest the notion that legislative attempts to create a licensing system for carrying a concealed weapon cast doubt on the constitutionality of § 941.23. On the contrary, said the court in *Cole,* such attempts "suggest that the legislature believes the concealed weapons law is still intact." *Cole,* 264 Wis. 2d 520, ¶ 42.

144

¶ 53. Second, to the extent the legislature's unsuccessful attempts to amend § 941.23 could be persuasive evidence of legislative intent, they would not support Fisher's claim of a constitutional right to carry a concealed weapon in his vehicle. In both legislative sessions since *Cole* and *Hamdan,* the legislature sought to add an exception to § 941.23 for carrying a concealed weapon in one's "dwelling or place of business or on land that he or she owns, leases, or legally occupies . . . ." 2003 S.B. 214, §§ 36, 39 (engrossed version); 2005 S.B. 403, §§ 50, 56.[8] It did not, however, seek to provide such an exception for carrying a concealed weapon in one's vehicle. Thus, the legislature's recent efforts are of no assistance to Fisher or those similarly situated.

¶ 54. We turn to Fisher's other categorical argument, that his vehicle is an extension of his business. This argument, of course, is an attempt to shoehorn his case into one of two locations under which the *Hamdan* court recognized that a citizen's interest in the right to keep and bear arms for purposes of security is at its apex.[9]

---

[8] The exception would not have applied to someone who is prohibited under state or federal law from possessing the weapon. 2003 S.B. 214, § 39 (engrossed version); 2005 S.B. 403, § 56.

[9] Fisher cites three cases, all from one jurisdiction, in which courts have concluded that a taxicab fits a "place of business" exception in a statute prohibiting the possession of a firearm. *See People v. Santana,* 354 N.Y.S.2d 387, 389 (N.Y. Crim. Ct. 1974); *People v. Anderson,* 344 N.Y.S.2d 15, 19 (N.Y. Crim. Ct. 1973); *People v. Santiago,* 343 N.Y.S.2d 805, 806 (N.Y. Trial Term 1971). Many other courts, however, have reached contrary conclusions with respect to similar exceptions in gun control laws, including concealed carry statutes. *Boston v. State,* 952

¶ 55.  Fisher's approach strikes a note of discord with both *Cole* and *Hamdan*. Were this court to so easily recognize a motor vehicle as an extension of one's privately-owned business, the result would be a significant retreat from *Cole*'s holding that "the right to bear arms is clearly not rendered illusory by prohibiting an individual from keeping a loaded weapon hidden either in a glove compartment or under the front seat in a vehicle." *Cole*, 264 Wis. 2d 520, ¶ 49. Likewise, such a result would make meaningless the *Hamdan* court's focus on a person's home and privately-owned business as the two places in which the constitutional right to keep and bear arms for purposes of security is at its apex.

¶ 56.  Contrary to both *Cole* and *Hamdan*, Fisher's approach paves the way for countless motor vehicle owners or operators to argue that they fall within this apex. We can conceive of no reason to distinguish between vehicles as an extension of one's privately-owned business and vehicles as an extension of one's home. Thus, for example, under Fisher's approach virtually anyone who regularly possesses personal valuables (such as jewelry), or even drives a luxury vehicle, would have a colorable claim of a constitutional privilege to carry a concealed weapon in his or her vehicle for security.

¶ 57.  These are not results that can be countenanced by either *Cole* or *Hamdan*. They are also not results that were intended under the constitutional amendment.

S.W.2d 671, 672 (Ark. 1997); *State v. Lutters*, 853 A.2d 434, 439–47 (Conn. 2004); *Yirenkyi v. District of Columbia Hackers' License Appeal Bd.*, 520 A.2d 328, 332 (D.C. 1987); *People v. Cosby*, 255 N.E.2d 54, 57 (Ill. App. Ct. 1969); *People v. Brooks*, 275 N.W.2d 26, 27 (Mich. Ct. App. 1979).

¶ 58. The court recognized in *Cole* that Article I, Section 25 was not generally intended to abrogate existing statutes that regulate firearms. In analyzing the legislative intent behind the amendment, the court cited favorably to a Legislative Council Staff memorandum, which stated that "it is unlikely that *any* of the current laws regulating or restricting either the possession or carrying of firearms is in serious jeopardy of being invalidated as an infringement of the proposed constitutional right." *Cole,* 264 Wis. 2d 520, ¶ 36 (emphasis added). "Clearly," the court concluded, "the legislature knew gun control laws existed and this memo shows that they also had reason to believe the passage of Article I, Section 25 would not impact the status of those laws." *Id.*

¶ 59. The court explained that a Legislative Reference Bureau drafting memo also "supports the proposition that the legislature intended gun control legislation . . . to survive the new constitutional right to bear arms." *Id.,* ¶ 37. The court held in *Cole* that "[t]he legislative history clearly suggests that the legislature did not intend to repeal reasonable gun laws such as the CCW statute." *Id.,* ¶ 39.

¶ 60. In fact, it appears that the primary impetus behind the amendment was to invalidate or preempt local bans on handgun ownership or possession. As Justice Prosser observed in a concurrence to *Cole* advancing that "the amendment deserve[d] a more nuanced interpretation," the amendment was "one of several reactions to municipal initiatives to ban handguns." *Id.,* ¶¶ 60–61 (Prosser, J., concurring).

¶ 61. The court repeated in *Hamdan* what it recognized in *Cole,* holding that the state's "broad police power to regulate the ownership and use of firearms

147

and other weapons continues, notwithstanding Article I, Section 25." *Hamdan,* 264 Wis. 2d 433, ¶ 39; *see also* Jeffrey Monks, *The End of Gun Control or Protection Against Tyranny?: The Impact of the New Wisconsin Constitutional Right to Bear Arms on State Gun Control Laws,* 2001 Wis. L. Rev. 249, 293 (concluding that the general intent of the legislature was to preserve Wisconsin's existing firearms laws).

¶ 62. Yet, despite all these affirmations of the general constitutionality of state gun control laws that existed at the time the amendment was adopted, the position advanced by Fisher is a broad attack on § 941.23. The consequences of his position cannot be squared with either the history of the amendment or this court's jurisprudence interpreting it.

¶ 63. We note that constitutional challenges to § 941.23 as applied to individuals carrying a concealed weapon in a vehicle are also likely to implicate the constitutionality of § 167.31, the statute that generally prohibits the transport of any firearm in a vehicle unless it is unloaded and encased. Although Fisher was not cited for a violation of § 167.31 at the time of this arrest, it is plain under the facts of the case that he could have been. To the extent courts entertain constitutional challenges to § 941.23 for carrying a concealed weapon in a vehicle, the constitutionality of § 167.31 will often be implicated as well. Although the constitutionality of § 167.31 is not before us today, we make these observations because they underscore the breadth of Fisher's argument and its uneasy fit with the history of the constitutional amendment.

¶ 64. Both the legislature and this court have spoken: carrying a concealed and dangerous weapon in a vehicle will generally be contrary to the state's interest in protecting the health, safety, and welfare of

148

Wisconsin citizens, and § 941.23 will not present a constitutional issue under Article I, Section 25 except in extraordinary circumstances.

## III

¶ 65. In sum, we conclude that § 941.23 is constitutional as applied to Fisher. His interest in exercising his right to keep and bear arms for purposes of security by carrying a concealed weapon in his vehicle does not substantially outweigh the state's interest in prohibiting him from carrying a concealed weapon in his vehicle.[10] We therefore reverse the circuit court's judgment of dismissal and remand this case for further proceedings.

*By the Court.*—The judgment of the Jackson County Circuit Court is reversed and the cause is remanded to the circuit court for further proceedings consistent with this opinion.

¶ 66. N. PATRICK CROOKS, J. (*dissenting*). Because I strongly disagree with the majority's reaffirmation of the constitutionality of Wis. Stat. § 941.23, despite the overwhelming passage of Article I, Section 25 of the Wisconsin Constitution, I respectfully dissent. Although this case presents an as-applied challenge to the constitutionality of § 941.23, I believe the statute is unconstitutional not only as applied here, but also on its face or per se, since it is contrary to Article I, Section 25. I write separately to reiterate the conclusions set

---

[10] Having concluded that Fisher has not secured an affirmative answer to the first question under *Hamdan,* we need not address the second question, whether he could exercise his right under Article I, Section 25 in a reasonable alternative manner that did not violate § 941.23.

forth in my concurrence/dissent in *State v. Hamdan,* 2003 WI 113, 264 Wis. 2d 433, 665 N.W.2d 785, in which I took the same position in regard to the unconstitutionality of § 941.23.[1] The broad language of Article I, Section 25 clearly overrides the very restrictive language of § 941.23.

¶ 67. A state, through its police power, may impose reasonable restrictions on the exercise of an individual's constitutional rights. It is undisputed that the constitutional amendment's broad declaration of the right to keep and bear arms may be reasonably limited by such police power. Yet, in light of our constitutional amendment which grants Wisconsin citizens the right to bear arms "for security, defense, hunting, recreation or any other lawful purpose," a statutory prohibition on carrying concealed weapons at all times,

---

[1] I acknowledge that the majority opinion's affirmation of the facial constitutionality of Wis. Stat. § 941.23 adheres to this court's own precedent as expressed in *State v. Hamdan,* 2003 WI 113, 264 Wis. 2d 433, 665 N.W.2d 785, and *State v. Cole,* 2003 WI 112, 264 Wis. 2d 520, 665 N.W.2d 328. I have both a great appreciation of and high regard for the importance of stare decisis in our legal system. However, adherence to precedent that is obviously flawed is far more harmful to the integrity of and confidence in our legal system than abandoning such precedent in favor of a proper determination of law. As United States Supreme Court Justice Benjamin Cardozo wrote:

> I am ready to concede that the rule of adherence to precedent, though it ought not to be abandoned, ought to be in some degree relaxed. I think that when a rule, after it has been duly tested by experience, has been found to be inconsistent with the sense of justice or with the social welfare, there should be less hesitation in frank avowal and full abandonment. We have had to do this sometimes in the field of constitutional law.

Benjamin N. Cardozo, The Nature of the Judicial Process, Yale University Press, 150 (1960 ed.)(footnote omitted).

under all circumstances, the sole exception being for peace officers, is not a reasonable exercise of the state's police powers. As I stated in my concurrence/dissent in *Hamdan,* "[t]he breadth of the statute is incompatible with the broad constitutional right to bear arms." *Hamdan,* 264 Wis. 2d 433, ¶ 103.

I

¶ 68. The majority undertakes an analysis as to whether Wis. Stat. § 941.23 is unconstitutional as applied to Fisher, and in doing so, ignores a fundamental flaw in its own reasoning by failing to recognize that the amendment is too broad, and the statute is too restrictive to coexist.

¶ 69. Although the majority opinion refuses to give Fisher the benefit of the constitutional amendment, it again engages in interpreting the judicially created exceptions laid out in *Hamdan.* The majority cites *Hamdan* for the proposition that "[i]f the constitutional right to keep and bear arms for security is to mean anything, it must, as a general matter, permit a person to possess, carry, and sometimes conceal arms to maintain the security of his *private residence* or *privately operated business* . . . ." *Id.,* ¶ 68 (emphasis added).

¶ 70. This court cannot create exceptions to Wis. Stat. § 941.23 to cure that statute's constitutional defects. That is the job of the Wisconsin Legislature.[2] It is

___

[2] This court plainly set forth the position that it is the role of the legislature, not the judiciary, to act in the area of laws concerning carrying concealed weapons. As we stated in *State v. Dundon:*

> Forty-three states have legislative enactments permitting citizens to carry concealed weapons under a variety of conditions

well-established in Wisconsin law that " '[w]here the language used in a statute is plain, the court cannot read words into it that are not found . . . even to save its constitutionality, because this would be legislation and not construction.' " *State v. Zarnke,* 224 Wis. 2d 116, 139, 589 N.W.2d 370 (1999) (citing *Mellen Lumber v. Indus. Comm.,* 154 Wis. 114, 120, 142 N.W. 187 (1913)). The legislature is the governmental body whose job it is to balance the competing interests between individuals and the public at large. This court must either uphold a statute as written, or strike it down as unconstitutional if it violates a constitutional provision. Judicially creating exceptions, on a case-by-case basis, is totally inappropriate.[3] The majority's attempt to tie the *Hamdan*

---

and circumstances. The existence of these many statutes underscores the impropriety of the judiciary attempting to act in this controversial policy area which is so clearly the province of other branches.

*State v. Dundon,* 226 Wis. 2d 654, 673, 594 N.W.2d 780 (1999). It should be noted that now only Wisconsin remains without such legislative enactments. *See infra* notes 3, 4 and 5.

[3] *See, e.g., Lang v. Lang,* 161 Wis. 2d 210, 224, 467 N.W.2d 772 (1991)(We cannot, under the guise of liberal construction, supply something that is not provided in a statute. . . .)(citing *Application of Duveneck,* 13 Wis. 2d 88, 92, 108 N.W.2d 113 (1961)); *State v. Martin,* 162 Wis. 2d 883, 907, 470 N.W.2d 900 (1991) (Our task is to construe the statute, not to rewrite it by judicial fiat.) (citing *State v. Richards,* 123 Wis. 2d 1, 12, 365 N.W.2d 7 (1985)); *State ex rel. Badtke v. Sch. Bd.,* 1 Wis. 2d 208, 213, 83 N.W.2d 724 (1957)(Modifications of the statute if it works badly or in unexpected and undesirable ways must be obtained through legislative, not judicial action.); *Columbus Park Hous. v. Kenosha,* 2003 WI 143, 34, 267 Wis. 2d 59, 671 N.W.2d 633 (citation omitted) ([I]t is the duty of this court to apply the policy the legislature has codified in the statutes, not impose our own policy choicesto do otherwise would render this court little more than a super-legislature. Thus, we must apply

exceptions to self-defense and "extraordinary circumstances" (Majority op., ¶¶ 32–33) demonstrates an intent to continue the one-exception-at-a-time approach of *Hamdan.*

¶ 71. Article I, Section 25 of the Wisconsin Constitution reads, in its entirety, "The people have the right to keep and bear arms for security, defense, hunting, recreation or any other lawful purpose." Wis. Const. art. I, § 25. In this case, it is undisputed that Fisher was carrying a weapon for "security" purposes—a purpose that falls unambiguously within the amendment. Also, there is no dispute that he had only a lawful purpose. Yet, the majority concludes that he had no right to do so. While reasonable time, place, and manner restrictions may comport with the constitutional amendment,[4] such public policy determinations are properly left to the legislature. The majority, instead of striking down the statute, attempts, yet again, to do the job of the legislature and to judicially rewrite Wis. Stat. § 941.23. The legitimate concerns of law enforcement are best addressed by the legislature, not by a piecemeal approach by this court.

¶ 72. Wisconsin Stat. § 941.23 could pass constitutional muster if it contained reasonable exceptions to the present far-reaching prohibition on carrying a concealed weapon. Wisconsin and Illinois are the only

---

the statute as written, not interpret it as we think it should have been written.).

[4] As I noted in *Hamdan,* other Wisconsin laws restricting weapons are narrowly tailored and therefore do not create the same constitutional problems as the statute at issue. *See, e.g.,* Wis. Stat. §§ 941.26 (ban on machine guns), 941.28 (ban on short-barreled shotguns and rifles), 941.29 (possession of a firearm by a felon), 948.60 (possession by a minor), and 948.605 (possession in a school). *Hamdan,* 264 Wis. 2d 433, ¶ 104 n.6.

states, except Alaska and Vermont,[5] without a law allowing residents to obtain permits to carry concealed weapons.[6] Even though Illinois has adopted a constitutional provision guaranteeing the right to bear arms, and a law prohibiting the carrying of concealed weapons, it has also adopted statutory exceptions to its concealed-carry law.[7] Except as noted, Wisconsin is the only state without such statutory exceptions and/or a permit system. Such exceptions, and/or a permit system, are necessary in light of the constitutional guarantees of Article I, Section 25. To relieve § 941.23 of its constitutional infirmity, the Wisconsin Legislature must either create a permit system so that qualified individuals may legally carry concealed weapons, and/or

---

[5] Alaska and Vermont allow the unpermitted carrying of concealed weapons.

[6] On March 23, 2006, the Kansas Legislature overrode Governor Kathleen Sebelius' veto of SB 418, a concealed weapons bill. The new law will go into effect on July 1, 2006. Also, Nebraska Governor Dave Heineman signed LB 454, allowing the carrying of concealed weapons, into law on April 5, 2006.

*See also* David B. Kopel, *The Licensing of Concealed Handguns for Lawful Protection: Support From Five State Supreme Courts,* 68 Alb. L. Rev. 305 n.3 (2005).

[7] *See* 720 Ill. Comp. Stat. 5/24–1(a) (2005), which provides in relevant part:

A person commits the offense of unlawful use of weapons when he knowingly:

. . . .

(4) [c]arries or possesses in any vehicle or concealed on or about his person except when on his land or in his own abode or fixed place of business any pistol, revolver, stun gun or taser or other firearm. . . ."

720 Ill. Comp. Stat. 5/24–1(a) (2005).

create exceptions to § 941.23 consistent with the use of the state's police power and the Wisconsin Constitution.

¶ 73. Despite the majority's contention to the contrary, the Wisconsin Legislature's attempts to modify Wis. Stat. § 941.23[8] are evidence of its belief that the present ban on carrying a concealed weapon is unconstitutional.[9] Majority op., ¶ 51. The majority dismisses the argument of legislative intent on the grounds that the failure of the legislation to become law indicates that § 941.23 is still intact, albeit with the majority's judicially created exceptions. The majority then proceeds to determine that even if such failed legislation was indicative of legislative intent, it would still fail to support Fisher's claim of a constitutional right to carry a concealed weapon in his vehicle for business security purposes. This reasoning is flawed. The fact that the bill did not become law is certainly not indicative of a legislative intent to maintain the concealed weapon statute as it currently exists. The bill twice passed in both the Assembly and the State Senate, only to be vetoed by the Governor. *See Ban on Concealed Weapons Stands*, Milwaukee J. Sentinel, Feb. 3, 2004, http://www2.jsonline.com:80/news/state/feb04/204715.asp; http://www.legis.state.wi.us/2005/data/SB403hst.html. Moreover, in both the 2003–04 and 2005–06 sessions, the Senate successfully overrode the veto, while the Assembly only failed to do so by one vote in 2003–04,

---

[8] In S.B. 214 (2003–04) and S.B. 403 (2005–06) the Wisconsin Legislature attempted to enact a permit system for carrying a concealed weapon and to create a home and business exception to Wis. Stat. § 941.23.

[9] While there is no Wisconsin case law that allows intent to be inferred from failed legislation, the legislative history in this case departs from the typical failed legislation and is therefore significant to the discussion of the constitutionality of Wis. Stat. § 941.23.

and by two votes in 2005–06. The majority, therefore, seems to confuse legislative intent with gubernatorial intent, despite the fact that the legislative intent could not be much clearer.

¶ 74.   As it did in *Hamdan,* the majority once again improperly holds that the determination of the facts is to be done as a matter of law, rather than decided by the trier of fact—usually a jury. Having judicially carved out an exception to Wis. Stat. § 941.23 for a privately owned business in *Hamdan,* the majority decides here, as a matter of law, that Fisher's car, which is used to transport his tavern's money to the bank, cannot be considered an extension of his place of business. Majority op., ¶ 56. Such weighing of the evidence and finding of facts relating to Fisher's constitutional defense is appropriate only for the trier of fact. The majority also fails to give any deference, whatsoever, to the facts found by the circuit court, the trier of fact in this case. The statute is clearly unconstitutional as applied to Fisher.

## II

¶ 75.   The majority in this case once again ignores the clear and explicit language of Article I, Section 25 of the Wisconsin Constitution, fails to strike down Wisconsin's overbroad and very restrictive concealed weapon statute, and instead continues to judicially re-write it, in order to attempt to cure its constitutional defects. I would hold that Wis. Stat. § 941.23 is unconstitutional in light of the constitutional amendment adopted overwhelmingly by Wisconsin citizens, both as applied here, and on its face given the broad language of Article I, Section 25.[10] Therefore, I respectfully dissent.

---

[10] As stated in my *Hamdan* concurrence/dissent, I would delay the holding for a reasonable period of time to allow time

156

¶ 76.   I am authorized to state that Justices JON P. WILCOX and PATIENCE DRAKE ROGGENSACK join that portion of this dissent that concludes that Wis. Stat. § 941.23 is unconstitutional as applied.

for the Wisconsin Legislature and the Governor to act. *See DOC v. Kliesmet,* 211 Wis. 2d 254, 267, 564 N.W.2d 742 (1997) (delaying, for one year, the effective date of this court's decision limiting the authority of the Wisconsin Department of Corrections to house inmates in county jails over sheriffs' objections).

*See also Holytz v. Milwaukee,* 17 Wis. 2d 26, 115 N.W.2d 618 (1962)(delaying for 40 days the effective date of this court's decision abrogating the doctrine of governmental tort immunity, while carefully analyzing the rights of the state in light of the Wisconsin Constitution); *Pascucci v. Vagott,* 362 A.2d 566 (NJ 1976)(delaying for 60 days the effective date of its decision invalidating a general assistance benefit schedule); *Hellerstein v. Assessor of Town of Islip,* 332 N.E.2d 279, 287 (NY 1975)(delaying for 18 months the effective date of its decision invalidating real estate assessment technique); *Bond v. Burrows,* 690 P.2d 1168 (Wash. 1984) (delaying for 15 days the effective date of its decision invalidating a sales tax differential between counties).