# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2019AP435-CR |

| | |
|---|---|
| COMPLETE TITLE: | State of Wisconsin, |
| |         Plaintiff-Respondent-Petitioner, |
| |    v. |
| | James Timothy Genous, |
| |         Defendant-Appellant. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 392 Wis. 2d 382,944 N.W.2d 359
(2020 – unpublished)

| | |
|---|---|
| OPINION FILED: | June 4, 2021 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | March 3, 2021 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Milwaukee |
|   JUDGE: | Dennis R. Cimpl |

JUSTICES:

HAGEDORN, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, and REBECCA GRASSL BRADLEY, JJ., joined. DALLET, J., filed a dissenting opinion, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined.

NOT PARTICIPATING:

ATTORNEYS:

For the plaintiff-respondent-petitioner, there were briefs filed by *Scott E. Rosenow,* assistant attorney general; with whom on the brief was *Joshua L. Kaul*, attorney general. There was an oral argument by *Scott E. Rosenow*.

For the defendant-appellant, there was a brief filed by *Leon W. Todd*, assistant state public defender. There was an oral argument by *Christopher P. August*.

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2019AP435-CR
(L.C. No. 2016CF3891)

STATE OF WISCONSIN        :        IN SUPREME COURT

**State of Wisconsin,**

    **Plaintiff-Respondent-Petitioner,**

**FILED**

    **v.**

**JUN 4, 2021**

**James Timothy Genous,**

    **Defendant-Appellant.**

Sheila T. Reiff
Clerk of Supreme Court

HAGEDORN, J., delivered the majority opinion of the Court, in which ZIEGLER, C.J., ROGGENSACK, and REBECCA GRASSL BRADLEY, JJ., joined. DALLET, J., filed a dissenting opinion, in which ANN WALSH BRADLEY and KAROFSKY, JJ., joined.

REVIEW of a decision of the Court of Appeals. *Reversed and cause remanded.*

¶1 BRIAN HAGEDORN, J. The question in this case is whether a vehicle stop was supported by reasonable suspicion of drug activity. Examining the totality of the circumstances, we hold the stop was lawful and reverse the court of appeals.[1]

---

[1] See State v. Genous, No. 2019AP435-CR, unpublished slip op. (Wis. Ct. App. Apr. 28, 2020).

I. BACKGROUND

¶2   At 3:36 a.m. on August 28, 2016, James Genous sat in a parked, running vehicle on a residential street in West Allis with its headlights turned on.  Genous momentarily turned off the headlights, and a woman emerged from the house he was parked in front of.  She entered the vehicle through the front passenger door and remained in the car for 10 to 15 seconds.  The woman then exited the vehicle and ran back into the house.  A few seconds later, the vehicle's headlights turned back on and the car pulled away.

¶3   West Allis Patrol Officer Adam Stikl watched these events from an unmarked squad car half a block away.  Two weeks prior, he received an intra-department email regarding K.S., a resident of the single-family home Genous was parked in front of.  K.S. was a known heroin and narcotics user who previously worked with the department.  The email explained that the department was no longer working with K.S. and that officers were to "keep an eye on her because she does obviously still use."  After receiving the email, Officer Stikl looked up K.S.'s physical description on his department's local system.  As Officer Stikl watched the brief, nighttime interaction when the events leading to this case took place, he observed that the woman entering and exiting Genous' car matched K.S.'s physical description.  He also knew from communications within his department that this area had a reputation for high drug-trafficking activity.

¶4   Based on this context and his training, Officer Stikl suspected he had witnessed a drug transaction.  As Genous drove

away, Officer Stikl followed him for about three blocks and executed a traffic stop. During the stop, officers discovered a handgun in Genous' vehicle. Genous was arrested and later charged with unlawful possession of a firearm by a felon.

¶5 Genous filed a motion to suppress the firearm evidence in part on the basis that Officer Stikl lacked reasonable suspicion to stop Genous' vehicle. The circuit court[2] denied the motion following a hearing. The court of appeals reversed, and we granted the State's petition for review.

## II. DISCUSSION

¶6 The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons . . . against unreasonable searches and seizures, shall not be violated." Genous and the State agree that Officer Stikl seized Genous by executing the traffic stop, but they disagree on whether the stop complied with the Fourth Amendment.

¶7 An investigatory stop, also known as a Terry stop, "usually involves only temporary questioning and thus constitutes only a minor infringement on personal liberty." State v. Young, 2006 WI 98, ¶20, 294 Wis. 2d 1, 717 N.W.2d 729. It allows police officers to briefly detain someone to "investigat[e] possible criminal behavior even though there is no probable cause to make an arrest." State v. Waldner, 206 Wis. 2d 51, 55, 556 N.W.2d 681

---

[2] The Honorable Dennis R. Cimpl of the Milwaukee County Circuit Court presided.

(1996). This type of limited stop complies with the Fourth Amendment "if the police have reasonable suspicion that a crime has been committed, is being committed, or is about to be committed." Young, 294 Wis. 2d 1, ¶20.

¶8 Reasonable suspicion must be supported by specific and articulable facts. Id., ¶21. While it is a low bar, a mere hunch is insufficient. Id.; State v. Eason, 2001 WI 98, ¶19, 245 Wis. 2d 206, 629 N.W.2d 625. Yet "officers are not required to rule out the possibility of innocent behavior before initiating a brief stop." State v. Anderson, 155 Wis. 2d 77, 84, 454 N.W.2d 763 (1990). The question is, "What would a reasonable police officer reasonably suspect in light of his or her training and experience?" Id. at 83-84; United States v. Cortez, 449 U.S. 411, 418 (1981) ("[A] trained officer draws inferences and makes deductions . . . that might well elude an untrained person.").

¶9 A reasonable suspicion determination is based on the totality of the circumstances. State v. Post, 2007 WI 60, ¶18, 301 Wis. 2d 1, 733 N.W.2d 634. We focus not on isolated, independent facts, but on "the whole picture" viewed together. Cortez, 449 U.S. at 417-18; see also United States v. Sokolow, 490 U.S. 1, 9-10 (1989) ("Indeed, Terry itself involved a series of acts, each of them perhaps innocent if viewed separately, but which taken together warranted further investigation." (internal quotation marks omitted)).

¶10 Therefore, our task is to consider everything observed by and known to the officer, and then determine whether a reasonable officer in that situation would reasonably suspect that

4

criminal activity was afoot.   Whether reasonable suspicion was present is a legal question we analyze independently, but we accept the circuit court's findings of historical fact unless they are clearly erroneous.   Post, 301 Wis. 2d 1, ¶8.

¶11  In this case, Officer Stikl suspected that the interaction he witnessed in Genous' car was a drug deal.  The facts show that his suspicion was objectively reasonable.  Informed by his training, experience, and department communications, Officer Stikl could reasonably infer quite a bit about the events he observed that night.  He knew that drug transactions often occur during brief exchanges in vehicles, which was consistent with the 10-15 second contact in Genous' car.[3]  He also knew that a brief meeting in a vehicle at 3:36 a.m., immediately after the vehicle's headlights are turned off, and in an area with a reputation for drug-trafficking, are potential indicators of illegal activity.[4]

---

[3] Officer Stikl testified that based on his training and experience, "a lot of these drug cars will come into our city, park in front of a house where they are going to sell their drugs to, make the deal inside their vehicle in front of the house and then leave."

[4] Genous disputed the strength of the evidentiary basis offered by Officer Stikl in support of the assertion that this was an area with high drug-trafficking activity.  Genous asks us to employ our supervisory authority to create evidentiary prerequisites for circuit courts considering this factor.

And perhaps most significantly, Officer Stikl had good reason to believe that the woman Genous met in his vehicle was a known drug user with whom his department had a documented history. All these factors, viewed collectively in the eye of a trained and experienced law enforcement officer, support the conclusion that Officer Stikl reasonably suspected a drug transaction had occurred.

¶12 Genous contests this conclusion largely by isolating various factors, attacking them one by one, and then excluding each factor from the totality-of-the-circumstances analysis. We reject "this sort of divide-and-conquer analysis." United States v. Arvizu, 534 U.S. 266, 274 (2002). It is true that a citizen visiting a vehicle at night does not automatically constitute grounds for law enforcement to intervene, nor do officers have a green light to detain and question anyone who has a short conversation with a known drug user.[5] But the reasonable suspicion

---

"Our supervisory authority is not to be invoked lightly," and we decline to do so here. Koschkee v. Evers, 2018 WI 82, ¶12, 382 Wis. 2d 666, 913 N.W.2d 878. Although its weight will vary from case to case, it is well-settled that an area's reputation for criminal activity is one of many relevant considerations in a reasonable suspicion inquiry. Illinois v. Wardlow, 528 U.S. 119, 124 (2000); State v. Morgan, 197 Wis. 2d 200, 210-13, 539 N.W.2d 887 (1995). Like other factual matters in a totality-of-the-circumstances analysis, an area's reputation for criminal activity is properly entrusted to circuit courts in the first instance, and challengeable on appeal as clearly erroneous. See State v. Post, 2007 WI 60, ¶8, 301 Wis. 2d 1, 733 N.W.2d 634. That has long been the law, and we see no need to depart from it now.

[5] See State v. Young, 212 Wis. 2d 417, 429-32, 569 N.W.2d 84 (Ct. App. 1997).

test is not an exercise in evaluating individual details in isolation. It is the whole picture, evaluated together, that serves as the proper analytical framework. See Sokolow, 490 U.S. at 9 ("Any one of these factors is not by itself proof of any illegal conduct . . . . But we think taken together they amount to reasonable suspicion.").

¶13 Considering the totality of the circumstances, we hold that a reasonable law enforcement officer knowing what Officer Stikl knew and seeing what he saw would reasonably suspect that the short-term contact he witnessed in Genous' car was a drug transaction. His investigatory stop of Genous' vehicle therefore complied with the Fourth Amendment. We reverse the court of appeals' conclusion to the contrary and remand to the court of appeals to address Genous' additional arguments not presented to this court.[6]

*By the Court.*——The decision of the court of appeals is reversed, and the cause is remanded to the court of appeals.

---

[6] Before the court of appeals, Genous argued that officers unlawfully searched his car as well as his shoes and socks. The court of appeals did not reach these issues because it concluded that the initial stop was unlawful. Neither party asked us to consider these questions, nor were they briefed. Therefore, it is proper to remand these questions to the court of appeals.

¶14  REBECCA FRANK DALLET, J.  (*dissenting*).  The record contains insufficient particular facts, as opposed to generalized suspicions and hunches, that Genous had committed or was about to commit a crime.  It appears that Genous's presence in an alleged "high-drug-trafficking area" played a disproportionate role in the circuit court's reasonable-suspicion analysis, coloring those general hunches as concrete suspicions.  Allowing that designation to so heavily influence the analysis——particularly when it is unsupported by any empirical evidence——continues a troubling erosion of the Fourth Amendment's particularized-suspicion requirement.  I therefore respectfully dissent.

I

¶15  An officer may conduct an investigatory traffic stop, akin to a Terry stop,[1] only if the officer has a "reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlow, 528 U.S. 119, 123 (2000); State v. Post, 2007 WI 60, ¶¶10-12, 301 Wis. 2d 1, 733 N.W.2d 634.  An officer must be able to point to concrete, particularized facts that warrant suspicion of a particular defendant; "inchoate and unparticularized suspicion[s] or 'hunch[es]'" are insufficient. Wardlow, 528 U.S. at 123-24 (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)); Post, 301 Wis. 2d 1, ¶10.

¶16  The circuit court here found the following facts:

- Genous was in a "high-drug-trafficking area" at 3:30am;

---

[1] Terry v. Ohio, 392 U.S. 1 (1968).

1

- after idling for some unknown period of time, Genous turned off his car along with the car's headlights;

- Genous had "short-term contact" with a female in front of her house; and

- a female who is a "known drug user" lived in that house.[2]

As the court of appeals correctly concluded, these facts are not "particularized" to Genous. State v. Genous, No. 2019AP435-CR, unpublished slip op., ¶15 (Wis. Ct. App. Apr. 28, 2020) (quoting State v. Young, 212 Wis. 2d 417, 433, 569 N.W.2d 84 (Ct. App. 1997)). Rather, they describe the conduct of "large numbers of law-abiding citizens in a residential neighborhood, even [one] that has a high incidence of drug trafficking." See Young, 212 Wis. 2d at 430.

¶17 Likewise, the majority opinion's analysis identifies no fact particular to Genous to give Officer Stikl reasonable suspicion that Genous was engaged in criminal activity. Rather, it asserts that a collection of generic facts, including that Genous was present in what Officer Stikl called a "high-drug-trafficking area," makes it reasonable for Officer Stikl to infer that Genous was trafficking drugs.

---

[2] Officer Stikl also noted that a contributing factor for why he stopped Genous was that Genous's car was registered in "another city." The majority opinion wisely omits this fact from its analysis since the "other city" in which Genous's car was registered was Milwaukee, mere blocks from where Genous was stopped in West Allis.

2

¶18 The record evidence, however, undermines that conclusion. Regarding the generic fact that "drug transactions often occur during brief exchanges in vehicles," Officer Stikl testified that neither he nor the West Allis Police Department had any information that Genous's car was "used to transport drugs," "used by a known drug dealer," or connected to a known drug user. As for this alleged "exchange," Officer Stikl testified that he could not "see what was going on inside" Genous's car. He testified that he saw no "physical contact" of any kind between Genous and the woman who got into his car, let alone an "exchange" that would resemble a drug transaction. Officer Stikl stated that he did not see the woman carrying anything on her way to or from Genous's car. He further admitted that drug transactions do not occur only at certain hours. See State v. Betow, 226 Wis. 2d 90, 96, 593 N.W.2d 499 (Ct. App. 1999) (noting the absence of case-law support for the proposition that drugs are more likely to be trafficked by car at night than at any other time of day).

¶19 Even Officer Stikl's "identification" of the woman as K.S., a "known drug user," is more generic than particular to Genous. Officer Stikl testified that, prior to this night, he had had no prior personal contact with K.S.——he had not even seen her picture. He testified that he "recognized" the woman as K.S. based on her "physicals" and that her address matched the house in front of which Genous had parked. It is unclear what Officer Stikl meant by "physicals," but the only specific identifying information he testified to was that K.S. was a "white female." He also testified that he did not know whether K.S. was the only white female who

3

lived in her house. And so the only "particular" fact on which Officer Stikl relied——that the woman who got into Genous's car was a drug user——was not a fact at all; it was just a hunch.[3] Thus, none of the individual facts reveals anything particular to Genous that gives rise to reasonable suspicion.

¶20 Even assessed collectively, these facts reveal nothing concrete and articulable suggesting that Genous engaged in criminal behavior. See United States v. See, 574 F.3d 309, 313-14 (6th Cir. 2009) (holding that "contextual factors" alone, without particularized behavior, are insufficient to warrant reasonable suspicion); State v. Evans, No. 2020AP286-CR, unpublished slip op., ¶¶39-47 (Wis. Ct. App. Jan. 28, 2021) (concluding there was no reasonable suspicion because the generic evidence regarding drug transactions did "not show that the officer observed [this defendant] exhibiting conduct consistent with drug cases"). The Fourth Amendment does not give the police "free license to stop . . . anyone" who shows up at the house of a person who previously used drugs. United States v. James, 62 F. Supp. 3d 605, 610-14 (E.D. Mich. 2014); see also United States v. Black, 707 F.3d 531, 542 (4th Cir. 2013) (holding that defendant's presence at night in "high-crime area" with a convicted criminal insufficient for reasonable suspicion); State v. Weyand, 399 P.3d 530, 535 (Wash. 2017) (holding that "merely visiting" a house known to police "because of the residents' histories of drug

---

[3] The record contains no information suggesting that the police ever learned exactly who got into Genous's car. Officer Stikl testified that neither he nor, as far as he knew, any other officer followed up with K.S.

4

possession and use, not for a history of selling or distributing" did not amount to reasonable suspicion). The Fourth Amendment requires particularized suspicion and we have none here.

II

¶21 Genous's case illustrates two problems with the label "high-crime area." First, the label can cloak general hunches as particularized suspicion. In this way, a location's characteristics may play a disproportionate role in a reasonable-suspicion analysis, thus running afoul of Wardlow. See Wardlow, 528 U.S. at 124 (holding that a location's characteristics, while relevant, cannot be determinative). And second, it is unclear what the term "high-crime area" actually means, making it difficult for circuit courts to know how much weight to give a location's characteristics in any particular analysis. We should therefore adopt objective criteria for evaluating an assertion that an area is high in crime.

¶22 Both problems were on display here. The only evidence in the record that this area of West Allis was a high-drug-trafficking area is Officer Stikl's testimony that there had been a single recent incident of "drug activity" two blocks south and five blocks west of where he stopped Genous.[4] One incident of an unknown nature occurring roughly half a mile away hardly qualifies this area as a high-drug-trafficking area. Yet that may be all it

---

[4] Officer Stikl testified that this other incident was included in his arrest report, but that report is not in the record. His testimony also alludes to "assemblies" and "briefings" identifying this area of West Allis as a high-drug-trafficking area. The details of those briefings, including dates, however, are also not in the record.

5

took to cast Genous' conduct as suspicious. And, as discussed above, nothing about Genous' conduct alone was reasonably suspicious. Genous briefly met in his car with a woman who may have been a drug user, in front of that woman's house. The police saw nothing that resembled an exchange and they had no information that Genous or Genous's car had been involved in any drug transaction. Thus, the record evidence suggests that Genous's location was more than just a "relevant" factor for whether his behavior was suspicious; it was determinative.

¶23 It is of little help, however, to just say that the circuit court may have given too much weight to Genous's location or that his location was improperly labeled. After all, under Wardlow, a person's location may be relevant to a reasonable-suspicion analysis. But for courts to know exactly how a person's location is relevant in a particular case, they must consider how that location is defined, especially when considering a vague term such as "high-crime area." What is the "area" the court is considering? Is it five blocks? Ten? As for what it means to be "high crime," how many incidents of crime were there and how recently did those incidents take place? See State v. Fisher, 2006 WI 44, ¶41, 290 Wis. 2d 121, 714 N.W.2d 495 (reasoning that a neighborhood could not "realistically be considered" a high-crime area because its crime rate was equal to other areas; characterizing it as such an area "would erase any meaningful distinction between a truly high-crime area and any other area"). Without a generally accepted understanding of what "high-crime area" means, its definition (and its boundaries) will shift from

6

court to court. See Andrew G. Ferguson, Crime Mapping and the Fourth Amendment, 63 Hastings L.J. 179, 203-05 (2011). Such a fluid concept injects ambiguity into an inquiry that "looks for the exact opposite"; what is needed for reasonable suspicion is "objective and particularized indicia of criminal activity." See United States v. Beauchamp, 659 F.3d 560, 571 (6th Cir. 2011).

¶15 It is therefore important for circuit courts to critically assess claims that a particular area is high in crime so as not to give that label undue weight in a reasonable-suspicion analysis. To that end, some courts and commentators have established or proposed criteria for assessing whether an area qualifies as a high-crime area. The First Circuit Court of Appeals has established a three-factor test for analyzing whether a trial court's high-crime-area finding is clearly erroneous. See United States v. Wright, 485 F.3d 45, 53-54 (1st Cir. 2007). First, there must be some "nexus" between the type of crime at issue in a particular case and the type of crime that forms the basis for the high-crime designation. Id.; see also United States v. Tinnie, 629 F.3d 749, 758 (7th Cir. 2011) (Hamilton, J., dissenting) (explaining that courts must find a "reasonable connection between the neighborhood's higher crime rate and the facts relied upon" to justify the stop). For example, a Terry stop based on a suspected drug transaction in an area with a high number of arrests for drug transactions. Wright, 485 F.3d at 53-54. Second, the area must be defined by "limited geographic boundaries." Id. General claims that an entire city is a high-crime area are insufficient. And third, the stop in question must be close in time to reports of

7

heightened criminal activity in that area, preventing an area from being perpetually designated "high crime" without continuing evidence. Id. The First Circuit allows evidence on these factors to include "a mix of objective data and the testimony of police officers," and it leaves open the possibility that other factors may be relevant in certain cases. See id. (noting that these factors will be relevant in "most cases"); see also United States v. Gorham, 317 F. Supp. 3d 459, 464-65 (D.D.C. 2018) (applying a similar test).

¶16 Some commentators have proposed a test that closely tracks the First Circuit's. See Andrew G. Ferguson & Damien Bernache, The "High-Crime Area" Question, 57 Am. U. L.R. 1587, 1628-40 (2008). Ferguson and Bernache's framework also includes three factors——nexus, geography, and timing——but they give empirical data a larger role in the analysis. Even if an officer geographically defines a high-crime area, they argue that courts should not accept that claim without objective, statistical evidence to support it. See id. at 1629-30. Requiring such evidence is "in line with Terry" in that a judge can meaningfully evaluate reasonable suspicion only if such claims are subjected to "detached, neutral scrutiny." Id. at 1630 (quoting Terry, 392 U.S. at 21). Whatever the criteria, this court should develop an objective test under which circuit courts can evaluate testimony that a particular place is a high-crime area. At the very least, circuit courts should not give determinative weight to unverified assertions that an area is high in crime when evaluating whether the totality of the circumstances evinces reasonable suspicion.

8

See e.g., People v. Harris, 957 N.E.2d 930, ¶¶13-15 (Ill. App. Ct. 2011) (holding that unsupported statements without further inquiry are "insufficient" to warrant "consideration for purposes of justifying a Terry stop"); State v. Morgan, 197 Wis. 2d 200, 218-19, 539 N.W.2d 887 (1995) (Abrahamson, J., dissenting) (rejecting as irrelevant an officer's claim that an area was high in crime because the officer failed to justify that claim).

III

¶24 It is often difficult to assess the impact of this court's decisions at the time they are made. Cases like this one often seem small in the law-developing context, just another fact-based decision. But the Fourth Amendment's protections are eroded "not in dramatic leaps but in small steps, in decisions that seem 'fact-bound,' case-specific, and almost routine." Tinnie, 629 F.3d at 754 (Hamilton, J., dissenting). Accepting without scrutinizing a claim that an area is a "high-crime area" unwittingly makes all residents and visitors in such areas more susceptible to searches and searches, thereby treating them as though they are "less worthy of Fourth Amendment protection." United States v. Curry, 965 F.3d 313, 331 (4th Cir. 2020). We must guard against such unequal treatment and ensure that the Fourth Amendment offers the same protection to everyone, no matter their location. See Utah v. Strieff, 579 U.S. ___, 136 S. Ct. 2056, 2069-70 (2016) (Sotomayor, J., dissenting).

¶25 Because there is no reasonable, particularized suspicion that Genous was committing a crime, and because an unsupported claim that Genous was in a "high-drug-trafficking area" played a

9

disproportionate role in the circuit court's reasonable-suspicion analysis, I respectfully dissent.

¶26 I am authorized to state that Justices ANN WALSH BRADLEY and JILL J. KAROFSKY join this dissent.