COURT OF APPEALS
DECISION
DATED AND FILED

March 4, 2025

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2021AP841**

STATE OF WISCONSIN

Cir. Ct. No. 2019CV159

IN COURT OF APPEALS
DISTRICT III

DANIEL L. LAMPHERE,

PLAINTIFF,

ANN M. LAMPHERE,

PLAINTIFF-APPELLANT,

V.

RYAN HULBACK, JAMES PRESSLEY, JONATHAN FICK, HOLLY HULBACK AND MARIA HERDAHL,

DEFENDANTS-RESPONDENTS.

APPEAL from a judgment of the circuit court for Barron County: MAUREEN D. BOYLE, Judge. *Affirmed*.

Before Stark, P.J., Hruz and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1      PER CURIAM. Daniel and Ann Lamphere filed a complaint asserting various claims against three Barron County law enforcement officers—Sergeant Ryan Hulback, Deputy James Pressley, and Deputy Jonathan Fick—and two Barron County dispatchers—Holly Hulback and Maria Herdahl.[1]  At trial, following the close of evidence, the circuit court granted the defendants' motion to dismiss as to some of the Lampheres' claims.  The jury subsequently found in favor of the defendants on the Lampheres' remaining claims.  The court then entered a final judgment dismissing all of the Lampheres' claims.

¶2      Ann, pro se, now appeals, arguing that the circuit court erred by dismissing some of her claims on the defendants' motion before the case went to the jury.[2]  For the reasons explained below, we conclude Ann has failed to show that the court erred by partially granting the defendants' motion to dismiss. Accordingly, we affirm.

---

[1] Because Ann and Daniel Lamphere share a surname, we refer to them individually by their first names throughout this opinion.  We refer to the respondents on appeal, collectively, as "the defendants."  We refer to Ryan Hulback as "Sergeant Hulback" and to Holly Hulback as "Hulback."

[2] The notice of appeal filed in this matter purported to initiate an appeal on behalf of both Daniel and Ann, but it was signed only by Ann.  By order dated May 19, 2021, we informed the Lampheres that a notice of appeal "cannot be signed by a non-attorney on behalf of another individual."  We therefore construed the joint notice of appeal "to have been unsigned by Daniel Lamphere, rather than having been signed on his behalf by Ann Lamphere," and we set a deadline for Daniel to file his own signed notice of appeal.  We noted that if Daniel failed to do so, our jurisdiction over the appeal would be "limited to the claims of Ann Lamphere." Thereafter, Daniel failed to file his own signed notice of appeal.  Consequently, Ann is the only appellant in this matter.

## BACKGROUND

¶3      On September 12, 2018, Barron County dispatch received a 911 hang-up call from a specific phone number.  Before the phone call was disconnected, dispatch heard yelling in the background.  The county's dispatch computer system showed that the call came from a cell phone, that the phone number belonged to Ann, and that Ann resided at an address on Arthur Avenue in the Village of Turtle Lake.  At that time, the county's computer system was not able to automatically register the GPS location of incoming calls, and it sometimes took time for the exact location of an incoming call to register in the system.

¶4      After receiving the hang-up call, dispatch attempted to call the number back multiple times and eventually spoke with Ann.  Ann told dispatch that a family argument had occurred, but that she could not talk about it or she would "be in trouble," and she subsequently hung up.  The dispatchers relayed this information to Deputy Pressley, Deputy Fick, and Sergeant Hulback of the Barron County Sheriff's Office and dispatched them to the Arthur Avenue address.[3]

¶5      When the deputies arrived at the Arthur Avenue address, they walked around the residence and heard no yelling, but Sergeant Hulback reported seeing lights on inside.  They attempted to make contact with Ann by knocking on the door loudly and asking to be let in, but no one answered.  They also yelled through an open window and tried other doors and a garage door, but they received no response.  While at the residence, the deputies received information that Ann had called dispatch back and stated that there was nothing wrong, that

---

[3] Throughout this opinion, we refer to Deputy Pressley, Deputy Fick, and Sergeant Hulback, collectively, as "the deputies."

she did not call 911, that nothing physical had taken place, that there were no weapons involved, and that it was just a family argument. Herdahl also informed the deputies that Ann had stated she would not open the door for them.

¶6     The deputies then decided to force entry into the residence. After doing so, the deputies cleared the residence and did not find anyone inside. Deputy Pressley then asked dispatch to contact Ann again. Dispatch did so and learned that Ann was sitting outside of the Turtle Lake Police Department in a yellow Mini Cooper automobile with her young grandson. Dispatch relayed that Ann was returning to the Arthur Avenue address, and the deputies decided to wait for her there.

¶7     The deputies subsequently observed a yellow Mini Cooper, which they knew to be Ann's vehicle, approaching the Arthur Avenue residence. When the vehicle got close to the residence, it revved its engine loudly, accelerated rapidly, and drove into an alley behind the residence. The deputies drove their squad cars toward the alley with their emergency lights activated and blocked the Mini Cooper from leaving.

¶8     Deputy Fick then made contact with Ann, advising her to turn her vehicle off, unlock the doors, and exit the vehicle. Ann refused to comply with these requests. According to the deputies, Ann was screaming at them; was uncooperative, excited, and agitated; and seemed out of control. Ann ultimately unlocked her vehicle's doors, and Deputy Pressley removed her from the vehicle. After Ann was handcuffed, she physically fought with the deputies before being placed in the back seat of one of their squad cars.

¶9     Deputy Fick spoke with Ann's grandson, who was in the Mini Cooper. The child told Deputy Fick that Ann and Daniel had been arguing with

4

their son, Bradley, and Bradley's significant other, Bobbi Skye, at Bradley's house on Grand Avenue in the Village of Turtle Lake. The deputies then transported Ann and her grandson to that location. According to the deputies, Ann continued to act aggressively and was agitated and destructive, attempting to kick a camera in the back seat of the squad car and trying to kick her way out of the squad car.

¶10 At the Grand Avenue residence, the deputies spoke with Daniel, Bradley, and Skye. At times, Ann screamed that she wanted medical attention for her throat, and she told the deputies that she had multiple health problems, including cancer. Ann also made a suicidal statement and threatened to punch Skye. Deputy Pressley contacted the county's crisis line and reported Ann's suicidal statement, but Ann refused to speak with the county's crisis team.

¶11 After conferring with a county crisis worker, the deputies decided to take Ann to jail. Ann then stated that she needed to use the restroom immediately because of medical issues and her use of a colostomy bag or similar device. Deputy Pressley took Ann inside the Grand Avenue residence and allowed her to use the restroom. While inside the residence, Ann calmed down, and the deputies decided not to take her to jail. Deputy Pressley then contacted the crisis team again and put them in touch with Daniel. At that point, the crisis team determined that Ann could safely be released into Daniel's care.

¶12 The Lampheres, pro se, subsequently filed the instant lawsuit against the two 911 dispatchers—Hulback and Herdahl—and Sergeant Hulback, Deputy Fick, and Deputy Pressley.[4] Generally, the Lampheres alleged

---

[4] The Lampheres' complaint named several additional parties as defendants. Those parties were dismissed from the case and are not relevant to this appeal. As such, we do not discuss them further.

(continued)

that: (1) the dispatchers violated Ann's right to due process under the Fourteenth Amendment when they relayed false and inaccurate information to the deputies and failed to provide complete information to the deputies; (2) the deputies violated the Fourth Amendment when they entered the Arthur Avenue residence without justification; (3) the deputies violated the Fourth Amendment when they unlawfully detained Ann; and (4) the deputies violated the Fourth Amendment by failing to provide necessary medical care for Ann.

¶13 The case proceeded to a three-day jury trial. After both sides rested, the defendants moved for dismissal of all of the Lampheres' claims based on insufficient evidence. The circuit court granted the motion to dismiss in part. The court began by noting that its task was to determine "whether or not there is sufficient evidence upon which a reasonable jury could find in favor of the [Lampheres]." The court further stated that the sufficiency of the evidence was measured against the legal standards set forth in the proposed jury instructions that the parties had submitted, and those legal standards did not appear to be in dispute.

¶14 Addressing the Lampheres' claims against the dispatchers, the circuit court stated that the applicable legal standard "is not one of 'negligence'; the standard here is one of 'recklessness.'" The court concluded there was no evidence "to suggest that the dispatchers were not doing their jobs, and that they were acting 'intentionally' to cause harm, or even 'recklessly' causing harm." To the contrary, the court stated, "If there was one constant theme … through the testimony of the dispatchers, it was that they were struggling to get information;

The Lampheres' complaint also purported to assert claims on behalf of their minor grandson who was present during the events described above. The Lampheres agreed to dismiss those claims, and the circuit court amended the caption to remove their grandson as a party.

they were attempting to get as much information as they could, even from other sources, and doing all of this within their other responsibilities … as dispatchers."

¶15     The circuit court next addressed the Lampheres' claims that the deputies unlawfully seized Ann in violation of the Fourth Amendment.  First, the court concluded there was no evidence that Deputy Fick or Sergeant Hulback had personally seized Ann.  The court then concluded the evidence showed that Deputy Pressley's seizure of Ann was justified.  The court noted that when Ann's vehicle approached the Arthur Avenue residence, it "quickly made a turn to the north and then sped away," leaving no question that Ann was "fleeing the officers."  The court further noted that Deputy Pressley "said, a minimum of five times on the stand, that he had reason to believe that either [Ann] was or had [been] or would be committing a crime."  Based on Deputy Pressley's testimony, the court concluded there "was clearly reasonable suspicion" to detain Ann.  The court further concluded that the extension of Ann's detention "was appropriate based on her continued behaviors"—i.e., her "completely uncontrollable, completely unpredictable" demeanor.

¶16     The circuit court next addressed the Lampheres' claims that the deputies violated Ann's constitutional rights by denying her medical care.  The court explained that, to prevail on those claims, the Lampheres would need to prove: (1) that Ann was detained; (2) that she needed medical care; (3) that the deputies denied her medical care; (4) that the denial was unreasonable; and (5) that she was harmed as a result.  Initially, the court concluded that there was "a basis within the evidence submitted here today" for the Lampheres' claims regarding the denial of medical care to go to the jury.  Subsequently, however, the court determined that there was no evidence that Deputy Fick, specifically, had denied Ann medical care.  The court therefore dismissed the denial of medical care claim

against Deputy Fick but allowed the denial of medical care claims against Sergeant Hulback and Deputy Pressley to go to the jury.[5]

¶17　The jury was therefore asked to determine: (1) whether Sergeant Hulback, Deputy Pressley, and Deputy Fick entered the Arthur Avenue residence without justification; and (2) whether Sergeant Hulback and Deputy Pressley unreasonably failed to provide medical care to Ann. The jury found in favor of the defendants on these claims.

¶18　The Lampheres moved for a new trial, alleging juror misconduct and improper jury instructions. The circuit court denied those motions and entered a judgment dismissing the Lampheres' claims. This appeal follows.[6]

## DISCUSSION

### I. Forfeiture

¶19　On appeal, Ann challenges only the circuit court's decision to dismiss some of her claims following the close of evidence. In response, the

---

[5] The circuit court rejected the defendants' alternative argument that all of the Lampheres' claims should be dismissed on qualified immunity grounds.

[6] We held this appeal in abeyance pending the resolution of Ann's appeal from the circuit court's order denying her petition for waiver of transcript fees. We summarily affirmed that order on August 15, 2023. *See **Lamphere v. Hulback**,* No. 2021AP1954, unpublished op. and order (WI App Aug. 15, 2023).

defendants assert that Ann forfeited her right to challenge the court's dismissal of those claims by failing to do so in a postverdict motion.[7]

¶20     In support of their forfeiture argument, the defendants cite **Herkert v. Stauber**, 106 Wis. 2d 545, 561, 317 N.W.2d 834 (1982) (citation omitted), where our supreme court stated, "It is clear that no error of the [circuit] court is reviewable as a matter of right on appeal without first moving for a new trial based on such error."   The defendants also cite **Hartford Insurance Co. v. Wales**, 138 Wis. 2d 508, 514, 406 N.W.2d 426 (1987), where our supreme court interpreted **Herkert** as holding that "on appeal the appellant cannot assert certain objections to the judgment because the objections were waived by the failure to make the required motion which would have brought alleged errors to the attention of the circuit court and would have allowed it to correct its own errors."

¶21     The **Herkert** court concluded that the appellants in that case forfeited their argument that the circuit court erred by failing to give a particular jury

---

[7] We pause here to note deficiencies in both sides' appellate briefs.  First, we observe that Ann's brief-in-chief repeatedly cites Ann's appendix, rather than the appellate record.  The Rules of Appellate Procedure require references to the appellate record, *see* WIS. STAT. RULE 809.19(1)(d) and (e) (2023-24), and an appendix "is not the record," *see* **Ripp Distrib. Co. v. Ruby Distrib. LLC**, 2024 WI App 24, ¶16 n.7, 411 Wis. 2d 630, 5 N.W.3d 930.

Second, the defendants' brief fails to comply with WIS. STAT. RULE 809.19(8)(bm) (2023-24), which requires a brief to "have page numbers centered in the bottom margin using Arabic numerals with sequential numbering starting at '1' on the cover."  Our supreme court has explained that this pagination requirement "will match the page number to the page header applied by the eFiling system, avoiding the confusion of having two different page numbers." S. CT. ORDER 20-07, 2021 WI 37, 397 Wis. 2d xiii (eff. July 1, 2021).

We admonish both sides that future violations of the Rules of Appellate Procedure may result in sanctions.  *See* WIS. STAT. RULE 809.83(2) (2023-24).

All references to the Wisconsin Statutes are to the 2023-24 version unless otherwise noted.

instruction because they did not raise that argument in the circuit court. *See Herkert*, 106 Wis. 2d at 560-61. *Hartford Insurance*, in turn, involved an untimely motion for a new trial "on the ground that there was no evidence to support the verdict and on grounds that either the instructions were erroneous or that requested instructions were improperly refused." *Hartford Ins. Co.*, 138 Wis. 2d at 515.

¶22 Neither *Herkert* nor *Hartford Insurance* involved a situation like the one in this case, where the circuit court granted a party's motion to dismiss certain claims following the close of evidence, over the nonmoving party's objection. The defendants cite no legal authority specifically supporting the proposition that a motion after verdict is required to preserve the nonmoving party's objection under these circumstances.[8] Unlike *Herkert* and *Hartford Insurance*, this is not a case where the appellant failed to "br[ing] alleged errors to the attention of the circuit court" and therefore prevented the court from "correct[ing] its own errors." *See Hartford Ins. Co.*, 138 Wis. 2d at 514.

¶23 To the contrary, the circuit court was well aware of Ann's opposition to the defendants' motion to dismiss, but it nevertheless granted that motion as to some of Ann's claims. Applying the forfeiture rule under these circumstances would not comport with the rule's purpose. *See State v. Counihan*, 2020 WI 12, ¶26, 390 Wis. 2d 172, 938 N.W.2d 530 ("The purpose of the forfeiture rule is to

---

[8] In support of their forfeiture argument, the defendants also cite *Jos. P. Jansen Co. v. Milwaukee Area District Board of Vocational, Technical & Adult Education*, 105 Wis. 2d 1, 312 N.W.2d 813 (1981), which they claim stands for the proposition that "[b]y failing to timely file motions after verdict, the plaintiffs deprive the circuit court of an opportunity to correct its own error." However, the pinpoint citation that the defendants provide for this proposition does not support it. *See id.* at 10.

enable the circuit court to avoid or correct any error as it comes up, with minimal disruption of the judicial process and maximum efficiency."); *see also* **State v. Coffee**, 2020 WI 1, ¶21, 389 Wis. 2d 627, 937 N.W.2d 579 ("The forfeiture rule should not be applied where its application would not further its purpose—the fair, efficient, and orderly administration of justice."). We therefore decline to conclude that Ann has forfeited her appellate arguments.[9]

## II. Dismissal of Ann's claims following the close of evidence

¶24 "In trials to the jury, at the close of all evidence, any party may challenge the sufficiency of the evidence as a matter of law by moving for … dismissal." WIS. STAT. § 805.14(4). The circuit court may not grant a motion to dismiss based on insufficiency of the evidence "unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party." Sec. 805.14(1).

¶25 On appeal, we will not "overturn a circuit court's decision to dismiss for insufficient evidence unless the record reveals that the circuit court was 'clearly wrong.'" **Weiss v. United Fire & Cas. Co.,** 197 Wis. 2d 365, 389, 541 N.W.2d 753 (1995) (citation omitted). A circuit court is "clearly wrong"

---

[9] In any event, "the forfeiture rule is a rule of judicial administration, and thus a reviewing court may disregard a forfeiture and address the merits of an unpreserved issue in an appropriate case." **State v. Counihan**, 2020 WI 12, ¶27, 390 Wis. 2d 172, 938 N.W.2d 530. Here, even if Ann had forfeited her current arguments, we would nevertheless exercise our discretion to address them, given Ann's pro se status, the fact that the circuit court considered and ruled on Ann's arguments, and the fact that the parties have addressed the merits of Ann's arguments in their appellate briefs.

when it grants a motion to dismiss based on insufficiency of the evidence despite the existence of credible evidence to support the plaintiff's claim. *See id.* "Because a circuit court is better positioned to decide the weight and relevancy of the testimony," an appellate court must "give substantial deference" to the circuit court's "better ability to assess the evidence." *Id.* at 388-89 (citation omitted).

### A. Claims against the dispatchers

¶26     Ann first argues that the circuit court erred by dismissing her claims against the dispatchers—Hulback and Herdahl. As noted above, Ann claims that the dispatchers failed to provide complete information to the deputies and, in fact, relayed false and inaccurate information to them. More specifically, Ann contends that the dispatchers violated her right to due process under the Fourteenth Amendment by: (1) dispatching the deputies to the Arthur Avenue address without obtaining complete information about the location from which the 911 call was made, even though they knew that the call had come from a cell phone; (2) failing to confirm whether Ann was located at the Arthur Avenue address; and (3) falsely telling the deputies that Ann had stated she would not answer the door for them.

¶27     The Due Process Clause of the Fourteenth Amendment prohibits a state actor from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV. "[O]nly intentional or reckless conduct violates the due process clause." *Salazar v. City of Chicago*, 940 F.2d 233, 238 (7th Cir. 1991) (citing *Archie v. City of Racine*, 847 F.2d 1211, 1218-19 (7th Cir. 1988)). "[N]either negligence nor even gross negligence is a sufficient

12

basis for liability."[10]  *Id.* (citing *Archie*, 847 F.2d at 1218-19).  "An act is reckless in the pertinent sense when it reflects complete indifference to [a] risk" of harm—that is, when the actor does not care whether the other person is harmed, despite knowing that there is a significant risk of harm.  *See Archie*, 847 F.2d at 1219.

¶28  Here, the circuit court determined that Ann had failed to present any credible evidence that the dispatchers' allegedly harmful conduct on the night in question was intentional or reckless.  Addressing the dispatchers' conduct in sending the deputies to the Arthur Avenue address, the court explained:

> The evidence that we have, and that the jury would consider, is that a 911 hang-up call was made; that after that 911 hang-up call was made, the dispatchers attempted to call back to a number that came up.  Once the 911 call comes in, the system creates this CAD, which then ties the cell phone to a specific address and provides this number.  They attempt to call it back.  Get no answer at times.  And then at times actually make contact with Ms. Lamphere, who doesn't immediately identify—identifies herself, … but says her name is "Ann."
>
> She also tells the dispatchers that she can't talk.  At no time does she identify that she's not at her home or that she's someplace else.  She specifically tells them that she … can't talk.  And … the dispatchers have—are also aware that there was some commotion or yelling in the background.  And, again, there's a belief by the dispatchers—I think Dispatcher Hulback referred to the fact that, you know, … when Ms. Lamphere couldn't talk,

---

[10] In the circuit court, both sides submitted proposed jury instructions that relied on *Archie v. City of Racine*, 847 F.2d 1211, 1218-19 (7th Cir. 1988), for the proposition that the dispatchers' conduct violated the Due Process Clause only if the dispatchers acted intentionally or recklessly in causing harm to Ann.  To the extent Ann now intends to argue that a negligence standard applies to her claims against the dispatchers, we conclude that she forfeited that argument by failing to raise or adequately develop it below.  *See Tatera v. FMC Corp.*, 2010 WI 90, ¶19 n.16, 328 Wis. 2d 320, 786 N.W.2d 810 ("Arguments raised for the first time on appeal are generally deemed forfeited."); *Schwittay v. Sheboygan Falls Mut. Ins. Co.*, 2001 WI App 140, ¶16 n.3, 246 Wis. 2d 385, 630 N.W.2d 772 ("A party must raise an issue with sufficient prominence such that the [circuit] court understands that it is called upon to make a ruling.").

> to them the assumption was that's because either someone was there that she couldn't speak in front of, or that she was just not capable of providing any additional information.
>
> So the dispatchers have very little information. They're attempting to use the system that exists in terms of identifying locations. There was clear testimony about the fact that there was no specific GPS pin as to where the cell phone was located. In fact, the information—all the information [they] had was that this cell phone was registered to Ms. Lamphere. And that she resided at [the Arthur Avenue address].
>
>   ….
>
> Eventually the dispatchers find out that when they get a phone call from Ms. Lamphere, that her grandson actually has to speak to them about, that [Ann and the child are] on their way back [to the Arthur Avenue address]. And so up until that point, I don't think there's evidence in the record that the dispatchers were aware that Ms. Lamphere was not at her residence.

The court further explained that while Ann was attempting to argue in hindsight that the dispatchers should have known that she was not at her address, there was no evidence "that the dispatchers acted with intentionality, for one thing, to intentionally misdirect the officers, or to even act with complete indifference to risk, not caring whether or not anyone was harmed."

¶29    There is no credible evidence in those portions of the trial record that are available for our review to support a conclusion that the dispatchers acted intentionally or recklessly by directing the deputies to the Arthur Avenue address. Notably, Herdahl testified at trial that she did not take the 911 call from Ann's phone number. Thus, she could not provide any testimony regarding the initial association between that phone number and the Arthur Avenue address. Ann has failed to provide this court with a transcript of the trial testimony provided by the other dispatcher—Hulback. The circuit court stated, however, that the evidence

14

showed that the county's internal system provided the Arthur Avenue address as the address for Ann's phone number and that there was "no specific GPS pin as to where the cell phone was located" at the time of the 911 call. It is the appellant's burden to ensure that the record is sufficient for us to review the issues raised on appeal, and we assume that any missing materials support the circuit court's decision. *See State Bank of Hartland v. Arndt*, 129 Wis. 2d 411, 423, 385 N.W.2d 219 (Ct. App. 1986). Thus, here, we must assume that Hulback's trial testimony supported the court's assessment that the information available to the dispatchers warranted sending the deputies to the Arthur Avenue address.

¶30 On appeal, Ann mainly argues that because the dispatchers knew that the 911 call came from a cell phone, they should have known that the call could have been made from a location other than the Arthur Avenue address. Ann also emphasizes that, during Herdahl's initial phone conversation with Ann following the 911 call, Herdahl never asked Ann where she was. These arguments could, potentially, support a claim that the dispatchers were negligent in directing the deputies to the Arthur Avenue address. We agree with the circuit court, however, that these arguments would not have provided a basis for the jury to conclude that the dispatchers acted intentionally or recklessly by sending the deputies to the Arthur Avenue address, given the information available to the dispatchers at the time.

¶31 In its decision, the circuit court also specifically rejected Ann's argument that Herdahl acted recklessly by telling the deputies that Ann had stated she was not going to answer the door for them. Our review of the portions of the trial record that are available to us reveals no credible evidence to support a determination that Herdahl acted recklessly in that regard.

15

¶32    During Herdahl's initial phone conversation with Ann on the night in question, following the 911 call, Ann made a comment about not answering the door.[11]  Herdahl interpreted Ann's comment as "I'm not going to answer the door for them."  Herdahl subsequently told the deputies that Ann had stated she would not answer the door for them.  At trial, Herdahl explained that she believed Ann's statement about not answering the door was directed "towards the law enforcement officers that we had sent there."  Herdahl conceded that Ann did not specifically reference law enforcement in her comment about not answering the door, but Herdahl testified she believed that comment was directed toward the deputies based on "the way the call was going."

¶33    At another point during the same conversation with Herdahl, Ann stated, "Oh God, here she comes back."  Herdahl conceded at trial that she did not ask Ann who "she" was.  Ann suggests that Herdahl should have interpreted Ann's statement about not answering the door in context with Ann's comment about a person coming back, and Herdahl therefore should have understood that Ann meant she was not going to answer the door for that individual.

¶34    As the circuit court noted in its oral ruling, the situation on the night when these events occurred was "chaotic," in large part due to Ann's own behavior.  As the court explained, because Ann "did not want to relay any information to the dispatchers at the time, it … created … the urgency for the dispatchers to figure out what was going on; because the assumptions were that [Ann] was in trouble."  The court reasoned that under these circumstances, to the

---

[11]  We have reviewed the audio recording of this phone call.  While Ann says something during the call about not answering the door, we cannot discern precisely what she says.

extent the dispatchers "may have been mistaken on certain things … that does not give rise to 'intentionality' or 'recklessness.'" We agree with the court's analysis in this regard.

¶35 In summary, the portions of the trial record that are available for our review do not contain any credible evidence that would permit a jury to conclude that the dispatchers acted intentionally or recklessly. As such, the circuit court properly granted the defendants' motion to dismiss Ann's claims against the dispatchers.

### B. Claim against Deputy Fick for failure to provide medical care

¶36 The Fourth Amendment prohibits unreasonable searches and seizures. U.S. CONST. amend. IV. "[A]n officer violates the [Fourth Amendment's] prohibition on unreasonable seizures when, in the course of making an otherwise lawful arrest, [the officer] does not respond reasonably to an arrestee's medical needs." *Florek v. Village of Mundelein*, 649 F.3d 594, 598 (7th Cir. 2011). "[F]our factors … are relevant for ascertaining whether a defendant's conduct was objectively unreasonable": (1) whether the defendant had notice of the arrestee's medical needs; (2) the seriousness of the medical needs; (3) the scope of the requested treatment; and (4) any countervailing police interests, including "administrative, penological, or investigatory concerns." *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007).

¶37 On appeal, Ann asserts that upon Deputy Fick's arrival at the Grand Avenue residence, he asked Daniel why Ann was "freaking out," and Daniel responded that Ann "had anxiety." Ann further asserts that Deputy Fick later spoke with Bradley Lamphere, who advised him that Ann "had extreme anxiety." Ann argues that Deputy Fick should have sought medical care for her

17

anxiety and that his failure to do so demonstrated a "complete indifference" to her medical needs.

¶38     Ann has failed to show that the circuit court's decision to dismiss her claim against Deputy Fick for failure to provide medical care was "clearly wrong." *See Weiss*, 197 Wis. 2d at 389 (citation omitted).  First, Ann fails to address the four factors set forth in *Williams* for ascertaining whether an officer's response to an arrestee's medical needs was objectively unreasonable.  In particular, Ann does not address the scope of any requested treatment or any countervailing police interests.  *See Williams*, 509 F.3d at 403.  We need not address undeveloped arguments, *see State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992), and we will not abandon our neutrality to develop arguments for a party, *see Industrial Risk Insurers v. American Eng'g Testing, Inc.*, 2009 WI App 62, ¶25, 318 Wis. 2d 148, 769 N.W.2d 82.

¶39     Second, while the appellate record contains various body camera and squad car camera videos that were introduced into evidence at trial, the record does not include transcripts of any of the deputies' trial testimony or of Ann's or Daniel's trial testimony.[12]  Without those transcripts, it is impossible for this court to assess whether the circuit court's decision to dismiss Ann's claim against Deputy Fick for failure to provide medical care was "clearly wrong."  *See Weiss*, 197 Wis. 2d at 389 (citation omitted).  As noted above, it is the appellant's burden to ensure that the record is sufficient for us to review the issues raised on appeal, and we assume that any missing materials support the circuit court's decision.  *See*

---

[12] The appellate record includes transcripts of only two limited excerpts of the trial: (1) Herdahl's testimony; and (2) the circuit court's oral ruling granting the defendants' motion to dismiss some of Ann's claims.

*State Bank of Hartland*, 129 Wis. 2d at 423. Thus, in this case, we must assume that the missing transcripts support the court's decision to dismiss Ann's claim against Deputy Fick.

### C. *Claims against Sergeant Hulback, Deputy Fick, and Deputy Pressley for unlawful detainment*

¶40 Finally, Ann contends that the circuit court erred by dismissing her claims that Sergeant Hulback, Deputy Fick, and Deputy Pressley violated the Fourth Amendment by unlawfully detaining her. An investigatory stop "allows police officers to briefly detain someone to 'investigat[e] possible criminal behavior even though there is no probable cause to make an arrest.'" *State v. Genous*, 2021 WI 50, ¶7, 397 Wis. 2d 293, 961 N.W.2d 41 (alteration in original; citation omitted). "This type of limited stop complies with the Fourth Amendment 'if the police have reasonable suspicion that a crime has been committed, is being committed, or is about to be committed.'" *Id.* (citation omitted). "Reasonable suspicion must be supported by specific and articulable facts." *Id.*, ¶8. "The question is, 'What would a reasonable police officer reasonably suspect in light of his or her training and experience?'" *Id.* (citation omitted).

¶41 Here, the circuit court determined that there was reasonable suspicion to detain Ann, based on Deputy Pressley's testimony to that effect.[13] Ann, however, has failed to provide us with a transcript of Deputy Pressley's trial testimony, or with transcripts of the trial testimony of Sergeant Hulback and

---

[13] As noted above, the circuit court determined that Ann's claims for unlawful detainment against Deputy Fick and Sergeant Hulback failed because there was no evidence that either Deputy Fick or Sergeant Hulback personally seized Ann. Ann disputes that conclusion on appeal. However, assuming without deciding Deputy Fick and Sergeant Hulback seized Ann, we see no reason why the circuit court's reasonable suspicion analysis would not be equally applicable to Ann's claims against Deputy Fick and Sergeant Hulback.

19

Deputy Fick. While the legal determination of reasonable suspicion is an objective test, *see State v. Anagnos*, 2012 WI 64, ¶60, 341 Wis. 2d 576, 815 N.W.2d 675, the deputies' testimony about the facts known to them at the time Ann was detained would have been highly relevant to a determination of whether reasonable suspicion existed for the detention. Similarly, any testimony regarding the deputies' training and experience, and how that training and experience contributed to the decision to detain Ann, would have been relevant to a reasonable suspicion analysis. *See Genous*, 397 Wis. 2d 293, ¶8.

¶42 Again, we must assume that the missing transcripts support the circuit court's decision. *See State Bank of Hartland*, 129 Wis. 2d at 423. In other words, we must assume that the missing transcripts support the court's determination that the deputies had reasonable suspicion to detain Ann. As such, Ann's failure to provide the necessary transcripts is fatal to her argument that the court erred by dismissing her claims against the deputies for unlawful detainment.

*By the Court.*—Judgment affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.