COURT OF APPEALS
DECISION
DATED AND FILED

March 17, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.   **2024AP2376-CR**

STATE OF WISCONSIN

Cir. Ct. No.  **2021CF155**

IN COURT OF APPEALS
DISTRICT III

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

V.

BRANDON LEE STRICKLAND,

  DEFENDANT-APPELLANT.

---

APPEAL from a judgment of the circuit court for Marinette County: JAMES A. MORRISON, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

¶1      STARK, P.J.  Brandon Lee Strickland appeals from a judgment convicting him, pursuant to his no-contest plea, of possession of methamphetamine as a repeater.  Strickland argues that the circuit court erred by denying his motion to suppress the evidence obtained from a search of his vehicle

after he was discovered passed out on the steering wheel of his car, which was parked in his driveway.

¶2  For the reasons that follow, we conclude, first, that law enforcement was acting pursuant to its community caretaker function when it first engaged with Strickland. Second, subsequent observations by the officer provided him with reasonable suspicion that Strickland had possessed or had used an illegal controlled substance, which then allowed the officer to extend Strickland's seizure to further investigate. And third, because Strickland was on felony probation, the officer had the authority to conduct a warrantless search of Strickland's vehicle under 2013 Wis. Act 79 and WIS. STAT. § 973.09(1d) (2023-24)[1] (hereinafter, Act 79 search). Accordingly, we affirm Strickland's judgment of conviction.

## BACKGROUND

¶3  On April 20, 2021, at approximately 7:30 a.m., Officer Andrew Bonjean with the City of Marinette Police Department responded to a report from a concerned citizen that "a male … was slumped over behind the [steering] wheel" of a parked vehicle at a residence on Parnell Street in the City of Marinette, Wisconsin.[2] When Bonjean arrived on the scene, he located the vehicle in a residential driveway apron and noted that the car was parked facing the garage door. When he approached the vehicle, he discovered "a male slumped over in the driver's seat, still buckled up, but the vehicle was off," and, after providing

---

[1] All references to the Wisconsin Statutes are to the 2023-24 version.

[2] The information in the background section of this decision comes from the complaint and from testimony at the hearing on Strickland's motion to suppress.

dispatch with the license plate number, he learned that the vehicle was registered to Strickland.

¶4 Bonjean then knocked on the driver's side window, and Strickland "startled" awake. Bonjean requested that Strickland open his car door so that they could speak to one another.[3] Strickland complied. Bonjean then asked for Strickland's identification. According to Bonjean, Strickland took "a little bit of time to … find his wallet, fumble through it, and then locate a driver's license." Bonjean learned from dispatch that Strickland was on probation; that he was subject to an active, nonextraditable warrant out of Georgia; and that he was parked in his own driveway.

¶5 Given that Strickland was awake and was talking, Bonjean testified that he did not believe that Strickland was necessarily in need of medical attention, but he asked Strickland to step out of the vehicle "to check if there was anything maybe medically wrong or just to see if there was some kind of impairment" to explain "why he was slumped over." When Strickland attempted to exit the vehicle, his seatbelt was still buckled, "so he had to readjust and undo the seatbelt." According to Bonjean, when Strickland "attempt[ed] to get out of the vehicle, he did stumble," and Bonjean had "to assist him into an upright position next to the car." At that time, Bonjean observed that Strickland had red, bloodshot eyes. As Strickland was exiting the vehicle, Bonjean also saw what appeared to be

---

[3] Bonjean testified that he asked Strickland to open his car door, rather than roll down his window, because it was unclear whether Strickland was suffering from an emergency or impairment and because some cars require that the car be running to put the windows down, and he did not want to risk Strickland driving away.

an orange syringe cap on the driver's side floorboard, which Bonjean testified, based on his training and experience, could be a sign of drug use.

¶6     Bonjean noted that Strickland struggled to follow Bonjean's directive to keep his hands out of his pockets. As a result, Bonjean asked Strickland if he could search him for safety, and Strickland consented. The search of Strickland's person revealed nothing. Bonjean then asked permission to search Strickland's vehicle, which Strickland refused and told Bonjean to get a warrant. Bonjean inquired what Strickland was on probation for, and Strickland informed Bonjean of the charges, which were nondrug-related felony offenses. Bonjean further testified that he knew that probationers and those released on extended supervision were subject to "basic rules" that prohibited alcohol or drug use and the commission of any new crimes.

¶7     Given Bonjean's observations—including Strickland's behavior, his bloodshot eyes, and the syringe cap on the floor of his vehicle—and Bonjean's knowledge that Strickland was on probation for a felony offense, Bonjean executed an Act 79 search on Strickland's vehicle. *See State v. Anderson*, 2019 WI 97, ¶21, 389 Wis. 2d 106, 935 N.W.2d 285. The Act 79 search revealed "[m]ultiple syringes" and methamphetamine.

¶8     The State charged Strickland with one count of possession with intent to deliver methamphetamine and two counts of possession of drug paraphernalia, all counts as a repeater. Strickland filed a motion to suppress the evidence recovered from his vehicle and his statements to law enforcement based on Bonjean's alleged violation of his Fourth Amendment rights. In his motion, Strickland argued the following: (1) that he was subject to an unlawful investigatory stop unsupported by reasonable suspicion; (2) that, to the extent

Bonjean may have engaged in community caretaker duties, Strickland was unlawfully detained after police "determine[d] he was not in need of further assistance"; and (3) that the search of his vehicle was an unlawful, warrantless search.

¶9 The circuit court held an evidentiary hearing on the motion to suppress, where Bonjean testified. The court ultimately denied Strickland's motion by oral ruling. The court first found that Bonjean had "behave[d] in a completely reasonable fashion when he approached the vehicle" based on a citizen's report that "Strickland was seen in the front seat of his car, passed out, apparently unresponsive, which creates clearly a community caretaker emergency." The court also determined that it was "clearly appropriate" and "[c]ompletely reasonable" for Bonjean to ask Strickland to open his car door and later to exit his vehicle to avoid a situation where a driver turns on the engine and attempts to escape. Thereafter, the court found that the totality of Bonjean's observations demonstrated reasonable suspicion of criminal conduct, which, in conjunction with Bonjean's discovery that Strickland was on probation for a felony offense, permitted the Act 79 search of Strickland's vehicle.

¶10 Strickland resolved this and other pending cases by a global plea agreement. He entered a no-contest plea to an amended charge of possession of methamphetamine, as a repeater, and the remaining charges were dismissed and read in. The circuit court sentenced Strickland to 18 months' initial confinement followed by 2 years' extended supervision. Strickland appeals. *See* WIS. STAT. § 971.31(10).

**DISCUSSION**

¶11 On appeal, Strickland argues that the "[p]olice violated [his] [F]ourth [A]mendment rights by detaining him and searching his car without legal cause" and that, as a result, the circuit court erred by denying his motion to suppress. (Formatting altered.) "Our review of a circuit court's decision denying a motion to suppress evidence presents a question of constitutional fact." *State v. Campbell*, 2024 WI App 17, ¶17, 411 Wis. 2d 439, 5 N.W.3d 870. Under that mixed standard of review, we "review the [circuit] court's findings of historical fact under the clearly erroneous standard and independently apply constitutional principles to those facts." *Id.*

¶12 The parties do not dispute that Strickland was subject to a law enforcement seizure. "[B]oth the Fourth Amendment to the United States Constitution and Article I, Section 11 of the Wisconsin Constitution protect against unreasonable seizures." *State v. Kelsey C.R.*, 2001 WI 54, ¶39, 243 Wis. 2d 422, 626 N.W.2d 777. "Seizures conducted without a warrant are unreasonable unless they fall within a recognized exception to the warrant requirement." *State v. Abbott*, 2020 WI App 25, ¶12, 392 Wis. 2d 232, 944 N.W.2d 8. This case involves the application of the community caretaker exception. *See State v. Kramer*, 2009 WI 14, ¶¶19-21, 315 Wis. 2d 414, 759 N.W.2d 598.

**I. Community caretaker exception**

¶13 "[O]fficers act as community caretakers when, viewed objectively, they engage in activities 'totally divorced from the detection, investigation, or acquisition of evidence' of a crime." *State v. Wiskowski*, 2024 WI 23, ¶16, 412 Wis. 2d 185, 7 N.W.3d 474 (citation omitted). "The question is whether," based

on the totality of the circumstances, "there is an 'objectively reasonable basis' to believe there is 'a member of the public who is in need of assistance.'" *State v. Ultsch*, 2011 WI App 17, ¶15, 331 Wis. 2d 242, 793 N.W.2d 505 (2010) (quoting *Kramer*, 315 Wis. 2d 414, ¶¶30, 32). Although an officer's subjective intent is not determinative, it "constitutes a factor that may be considered in the totality of the circumstances." *Kramer*, 315 Wis. 2d 414, ¶31.

¶14 When assessing the application of the community caretaker exception to Fourth Amendment intrusions, our state courts apply a three-step test. *Wiskowski*, 412 Wis. 2d 185, ¶17. The first step requires a court "to determine whether a seizure within the meaning of the Fourth Amendment occurred." *Id.*, ¶18.

¶15 The second step asks "whether the officer was engaging in a bona fide community caretaking function." *Id.*, ¶19. "This means we examine whether this was an objective effort to assist a member of the public in need that was 'totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.'" *Id.* (citation omitted).

¶16 Finally, the third step asks "whether the officer's exercise of a bona fide community caretaker function was reasonable." *Kramer*, 315 Wis. 2d 414, ¶40. Under this step, "we balance the 'public interest or need that is furthered by the officer's conduct against the degree of and nature of the restriction upon the liberty interest of the citizen.'" *Wiskowski*, 412 Wis. 2d 185, ¶20 (citation omitted). In doing so, we consider the following factors:

> (1) the degree of the public interest and the exigency of the situation; (2) the attendant circumstances surrounding the seizure, including time, location, the degree of overt authority and force displayed; (3) whether an automobile is involved; and (4) the availability, feasibility and

effectiveness of alternatives to the type of intrusion actually accomplished.

*Id.*, ¶20 n.7 (citation omitted). "The State bears the burden of proving that the officer's conduct fell within the scope of a reasonable community caretaker function." ***Kramer***, 315 Wis. 2d 414, ¶17.

¶17 In this case, Strickland concedes that Bonjean's "initial action of entering Mr. Strickland's property and approaching his car was arguably a community caretaking function," and "for purposes of this appeal, Mr. Strickland does not argue otherwise." We appreciate and agree with Strickland's concession, and we will not address Strickland's initial seizure further.

¶18 Strickland asserts, however, that Bonjean's "actions quickly became unlawful when Mr. Strickland was easily startled awake and spoke with the officer, and the officer determined he did not need medical assistance." In contrast, the State argues that Strickland is conflating the emergency aid exception and the community caretaker exception, which "are two separate inquiries." *See* ***State v. Pinkard***, 2010 WI 81, ¶26 n.8, 327 Wis. 2d 346, 785 N.W.2d 592. According to the State, whether Bonjean had determined that Strickland needed medical assistance or not, the issue in this case is the community caretaker exception, and "the record aptly supports the conclusion that Officer Bonjean was, in fact, engaged in a reasonable exercise of his community caretaker function from the point he first seized Strickland until after Strickland exited his vehicle."

¶19 We agree with the State and conclude that Bonjean was lawfully engaged in a community caretaker function through the point at which Strickland exited his vehicle. Given the acknowledged validity of Bonjean's initial act of entering Strickland's driveway and engaging with him, the specific question in this

case becomes: at what point did Bonjean resolve the reason for the initial seizure? *See Wiskowski*, 412 Wis. 2d 185, ¶21.

¶20     In addressing this question, we consider the three-step community caretaker analysis up to the point at which Strickland exited his vehicle. First, it is undisputed that Strickland was still subject to a Fourth Amendment seizure at this time. *See id.*, ¶18.

¶21     Second, we conclude that Bonjean was still engaging in a bona fide community caretaker function when he asked Strickland to exit his vehicle. *See id.*, ¶19.   According to Strickland, however, any need for assistance ended while he was still in the car and when Bonjean did not perceive any signs of a severe opiate overdose, such as "pupil dilation, slack and droopy muscles, slurring speech, loss of consciousness, inability to speak, choking sounds, vomiting, paleness, or clamminess."   We disagree and concur with the State that "it was reasonable for Officer Bonjean to take an added step of asking Strickland out of his vehicle to confirm his belief that there was nothing 'medically wrong' with him."   As the State argues,

> [W]hen Officer Bonjean directed Strickland out of his car, he knew from his own observations that Strickland had fallen unconscious while still buckled up behind the wheel of a car ….   He knew from a neighbor that Strickland remained in that spot long enough to arouse attention and allow him to travel to the scene.   And he knew that Strickland struggled to find his wallet and retrieve his driver's license from within.

¶22     Further, Bonjean testified that he had two reasons for asking Strickland out of his car: (1) "to check if there was anything maybe medically wrong" with Strickland; and (2) "to see if there was some kind of impairment." Bonjean's testimony reveals that he continued to hold legitimate concerns about Strickland's well-being when he asked him out of the vehicle. *See Kramer*, 315

Wis. 2d 414, ¶31 (subjective intent is a factor to consider). The fact that Strickland had regained consciousness did not require Bonjean to walk away because Strickland still objectively appeared to be having difficulties. In other words, there could have been other medical issues affecting Strickland that could not be determined while he remained seated in his vehicle. The fact that Strickland was discovered unconscious, while in his vehicle, at 7:30 a.m.—rather than in the evening or very early morning hours—also lends support to Bonjean's continued concern, as we conclude that being unconscious at this time of day is more indicative of a possible medical issue as opposed to some other impairment.

¶23 In his reply brief, Strickland challenges the State's arguments by appearing to assume that community caretaker duties are synonymous with needing to call for emergency medical assistance, i.e., an ambulance. However, our legal definition of a community caretaker function is not so narrow; an "emergency" is not required. *See Ultsch*, 331 Wis. 2d 242, ¶15. Bonjean articulated his concern that there may still have been something "medically wrong" with Strickland, which reasonably warranted further investigation.

¶24 Further, the fact that Bonjean testified that he was also looking for impairment does not negate his legitimate community caretaker concerns. *See Kramer*, 315 Wis. 2d 414, ¶30 ("[I]n a community caretaker context, when under the totality of the circumstances an objectively reasonable basis for the community caretaker function is shown, that determination is not negated by the officer's subjective law enforcement concerns."). Having made those observations, we conclude that Bonjean was objectively still engaging in a bona fide community caretaker function when he asked Strickland to exit his vehicle.

¶25    Third, and finally, we analyze the reasonableness of Bonjean's exercise of his community caretaker duties by balancing the "public interest or need that is furthered by the officer's conduct against the degree of and nature of the restriction upon the liberty interest of the citizen" and by considering the attendant four factors. *See* *Wiskowski*, 412 Wis. 2d 185, ¶20 & n.7 (citation omitted). Based on our review of the record, we conclude that all four factors weigh in favor of the reasonableness of Bonjean's actions.

¶26    First, as to the degree of the public interest and the exigency of the situation, Strickland argues that there was no exigency because Bonjean had "determined [Strickland] did not need medical assistance." However, as noted above, just because Strickland was awakened by Bonjean does not mean that a reasonable officer exercising his or her community caretaking function would have or should have turned and walked away at that point. As the State argues,

> Bonjean is not a physician; he was a police officer who, although trained to detect signs of impairment, did not appear to have similar training in identifying medical diagnoses that might cause a motorist to lose consciousness behind the wheel or even struggle to locate a wallet and driver's license. Though he may not have believed that Strickland was currently suffering from a medical condition that put him in physical danger, that didn't mean the officer had ruled out the possibility that Strickland was suffering from a less severe ailment for which he could offer some assistance.

Strickland argues in reply that, if true, Bonjean "fail[ed] to articulate a concern about" a "lesser ailment," but, again, Bonjean is not a medical professional. We agree with the State that "[w]hile the public interest and exigency of the situation may have decreased once Strickland was awake and speaking," the fact "that he had fallen unconscious at all was still cause for concern, particularly given his ensuing difficulty retrieving his wallet and driver's license" and the time of morning. *See id.*, ¶20 n.7.

11

¶27 As to the second factor, whether the "time, location, and degree of overt authority and force displayed" were appropriate under the circumstances, *see id.*, we agree with the State that the circumstances surrounding the seizure remained essentially the same from the time of Strickland's initial seizure until the point at which he was asked out of his vehicle. Bonjean approached the vehicle on foot while it was parked in Strickland's driveway. There is no indication in the record that Bonjean had activated his own police vehicle's lights prior to engaging with Strickland, that Bonjean had drawn his weapon, or that Bonjean exhibited any other displays of authority or force. *See* **State v. Dresser**, No. 2020AP2017-CR, unpublished slip op., ¶¶16-17 (WI App July 22, 2021) (explaining, in a case where the defendant challenged an officer's decision to activate his emergency lights as "an overt display of authority," that "this point alone does not outweigh the undeniable public interest in law enforcement responding to individuals who may be suffering from the effects of substance abuse or other medical emergencies").[4]

¶28 Further, Bonjean's request for identification and to speak with Strickland outside of his car, rather than through the open car door, does not demonstrate a high degree of overt authority or a display of force.[5] *Cf.* **State v. Brown**, 2020 WI 63, ¶20, 392 Wis. 2d 454, 945 N.W.2d 584 (asking lawfully detained motorist to exit vehicle "is 'of no constitutional moment'" (citation

---

[4] An unpublished opinion issued on or after July 1, 2009, and authored by a single judge may be cited for its persuasive value. WIS. STAT. RULE 809.23(3)(b).

[5] We note that Strickland argues in his reply brief that "directing a person to exit their car is not a 'minimal showing of authority.'" Although he quotes and cites the State's brief, he fails to cite any legal authority for this proposition. "Arguments unsupported by references to legal authority will not be considered." **State v. Pettit**, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

omitted)); *United States v. Hensley*, 469 U.S. 221, 235 (1985) ("When the Covington officers stopped Hensley, they were authorized to take such steps as were reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop."); *State v. Smith*, 2018 WI 2, ¶2, 379 Wis. 2d 86, 905 N.W.2d 353 ("We hold that when an officer conducts a valid traffic stop, part of that stop includes checking identification."). Accordingly, we conclude that the second factor also weighs in favor of reasonableness.

¶29     "Under the third factor, we consider whether the involvement of an automobile has an effect on whether the community caretaker function was reasonably performed." *Kramer*, 315 Wis. 2d 414, ¶44. Here, Bonjean walked up to Strickland's driver-side window and knocked on it in an attempt to wake him up. Bonjean later asked Strickland to open his driver-side door in order to speak with him, rather than requiring him to turn on the car to roll down the window, and also requested that Strickland step out of the vehicle to assess him further. Given the totality of the circumstances, including Bonjean's concern that Strickland might attempt to drive away before he could ascertain Strickland's condition, Bonjean's approach was reasonable.

¶30     The fourth and final factor, which looks at the availability, feasibility, and effectiveness of alternatives to the type of intrusion actually accomplished, also weighs in favor of reasonableness. *See Wiskowski*, 412 Wis. 2d 185, ¶20 n.7. Strickland appears to assume that any assessment that Bonjean conducted to determine whether Strickland needed emergency assistance could be done while he was seated in his vehicle; therefore, he does not argue that there were any feasible alternatives. Given the totality of the circumstances, as discussed above, Bonjean's request that Strickland exit his vehicle so Bonjean could verify his well-being was reasonable and unintrusive.

¶31 Strickland argues, however, that *Wiskowski* is "[i]nstructive" because, in that case, our supreme court "determined that police acted unreasonably in prolonging the seizure of [a] man who had been sleeping in his car." In *Wiskowski*, a McDonald's employee called police after the defendant fell asleep behind the wheel in the drive-through lane. *Id.*, ¶3. When an officer arrived at the scene "a minute or so later," he observed the defendant exit the drive-through lane, make a proper turn, and drive normally without any traffic violation. *Id.*, ¶¶3-4. Nevertheless, the officer executed a traffic stop. *Id.*, ¶4. The defendant told the officer that he had been working for 24 hours, and he was tired. *Id., ¶5.* The officer testified that the defendant was "acting normal," did not appear sleepy, was not slurring his speech, showed no signs of a medical issue, and the officer did not smell alcohol or observe signs of intoxication. *Id.* However, the defendant initially gave the officer the insurance card for the wrong vehicle, which the officer characterized as "odd." *Id.*

¶32 After conversing with a second officer for approximately five to six minutes and learning that the defendant had three prior OWI convictions, the officer ordered the defendant out of his vehicle. *Id.*, ¶6. Once outside the vehicle, the officer smelled alcohol and noticed the defendant stumble. *Id.*, ¶7. He then conducted field sobriety tests and thereafter arrested the defendant. *Id.* The defendant moved to suppress the evidence, which the circuit court and this court denied on community caretaker grounds. *Id.*, ¶¶8-9.

¶33 Our supreme court reversed, concluding that even if the original stop was a bona fide community caretaking activity, the officer had no reasonable suspicion to prolong the stop. *Id.*, ¶25. The court explained that while "[i]t is true that falling asleep in a drive-thru during the day could be a sign someone is impaired" and "officers need not rule out the possibility of innocent behavior to

initiate a traffic stop," "without any additional indicators of impairment, we conclude this is too speculative to amount to reasonable suspicion." *Id.*, ¶13.

¶34 Strickland argues that when compared with *Wiskowski*, "there is even less reason to believe criminal activity was afoot where, in addition to the fact that Mr. Strickland was not showing signs of a medical emergency, he had been sleeping in a parked car in his own driveway in the early morning, and did not have a history of OWI."

¶35 We agree with the State that Strickland's situation "was not a case like *Wiskowski*." Here, unlike in *Wiskowski*, the parties concede that Strickland's initial seizure began as a bona fide community caretaker operation, Strickland was still unconscious when Bonjean first engaged with him, Bonjean had no opportunity to observe Strickland driving, Strickland was unconscious for a longer period, Bonjean did not testify that Strickland was "acting normal" once he spoke to him, there was no evidence presented to explain why Strickland fell asleep in his driveway rather than making it into his home, Strickland had trouble locating his wallet and then presenting his driver's license when Bonjean requested it, and Bonjean did not hold Strickland for any amount of time while he tried to determine if he indeed had reasonable suspicion. *See id.*, ¶¶3-6. The only similarity between these cases appears to be that the defendants both fell asleep at some point. Given the material factual differences between these cases, we are not persuaded that the holding in *Wiskowski* requires a certain result here.

¶36 Therefore, and for the foregoing reasons, we conclude that Bonjean did not illegally extend Strickland's seizure under the community caretaker exception when Bonjean requested that Strickland exit his vehicle. Given Strickland's behavior after he woke up, Bonjean's request was meant to dispel any

lingering concerns about Strickland's well-being and was a reasonable exercise of his community caretaking duties. The State has met its burden to show that Bonjean did not violate Strickland's Fourth Amendment rights when he asked Strickland to exit his vehicle.

## II. Reasonable suspicion to extend Strickland's seizure

¶37 The next question is whether Bonjean lawfully extended Strickland's initial seizure based on reasonable suspicion of criminal activity. "The general rule across jurisdictions … is that a seizure," including a seizure to allow law enforcement to exercise its community caretaker function, "should not be extended beyond its initial justification absent some other justification that emerges, like reasonable suspicion." *Id.*, ¶21. Therefore,

> [i]f, during a valid traffic stop, the officer becomes aware of additional suspicious factors which are sufficient to give rise to an articulable suspicion that the person has committed or is committing an offense or offenses separate and distinct from the acts that prompted the officer's intervention in the first place, the stop may be extended and a new investigation begun.

*State v. Colstad*, 2003 WI App 25, ¶19, 260 Wis. 2d 406, 659 N.W.2d 394 (citation omitted); *see also Wiskowski*, 412 Wis. 2d 185, ¶27.

¶38 "Reasonable suspicion requires that '[t]he officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion of the stop.'" *State v. Floyd*, 2017 WI 78, ¶20, 377 Wis. 2d 394, 898 N.W.2d 560 (alteration in original; citation omitted). This standard requires "more than an officer's 'inchoate and unparticularized suspicion or hunch.'" *State v. Post*, 2007 WI 60, ¶10, 301 Wis. 2d 1, 733 N.W.2d 634 (citation omitted). However, "[r]easonable suspicion is 'a low bar.'" *State v. Nimmer*, 2022 WI 47, ¶25, 402 Wis. 2d 416, 975 N.W.2d

16

598 (citation omitted). Furthermore, "[a]lthough officers sometimes will be confronted with behavior that has a possible innocent explanation, a combination of behaviors—all of which may provide the possibility of innocent explanation—can give rise to reasonable suspicion." *State v. Hogan*, 2015 WI 76, ¶36, 364 Wis. 2d 167, 868 N.W.2d 124. Whether the facts as found by the circuit court constitute reasonable suspicion is a question of law we review de novo. *State v. Young*, 2006 WI 98, ¶17, 294 Wis. 2d 1, 717 N.W.2d 729.

¶39 Based on our review, we conclude that upon Strickland exiting his vehicle, Bonjean had accumulated specific, articulable facts that, along with his experience and training, supported a reasonable suspicion that Strickland had possessed and consumed an illegal controlled substance.[6] The information known to Bonjean was as follows: Strickland was passed out behind the wheel of his vehicle at 7:30 a.m. for an unknown amount of time, but enough time had passed to allow a neighbor to notice him, to call the police, and to allow Bonjean to drive to that location; he was found with his seatbelt still fastened and his car off;[7] Strickland had difficulty finding his wallet and then his driver's license when Bonjean requested his identification; Strickland was on probation for a felony, nondrug-related offense; he had a warrant out for his arrest in another jurisdiction;

---

[6] As an initial matter, the State argues that "Bonjean had made enough observations to support reasonable suspicion even before asking Strickland out of his car." Given our conclusion above that Bonjean was still engaging in community caretaker activities when he asked Strickland out of his car, we need not address this issue. *See State v. Castillo*, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997) ("An appellate court should decide cases on the narrowest possible grounds.").

[7] Bonjean acknowledged during his testimony that he "often" comes "across someone who [is] sleeping in their car." But when he was pointedly asked if he recalled finding a driver who was "unconscious, sleeping, whatever, not responsive immediately with a seatbelt on and … the engine not running," he identified one other instance: an overdose in a Kwik Trip parking lot.

he tried to step out of his vehicle with his seatbelt still fastened; he stumbled when he eventually got out of his car, and Bonjean had to help him stand upright; his eyes were red and bloodshot; he struggled to keep his hands out of his pockets; and Bonjean observed an orange syringe cap on the floor of Strickland's vehicle, an item Bonjean associated with intravenous drug users. These facts were sufficient to provide Bonjean with reasonable suspicion to extend Strickland's seizure to investigate possible drug use.

¶40    Strickland challenges this conclusion by addressing each observation individually, asserting that "[n]othing about this scenario indicates criminal activity." For example, he argues that "[m]any people fall asleep in their cars, at one time or another, for a multitude of reasons—perhaps they are returning from a third-shift and want to catch some moments of sleep before going inside." Further, he contends that "[t]aking a little bit of time to find one's ID in their wallet is par for the course, particularly for someone who had just been startled awake" and that "[m]ost people who have just woken up have red eyes and are moving more slowly." Strickland also notes that he "was on probation for a non-drug[-]related offense," "[h]e had a valid registration and ID," and "[t]here was nothing illegal on his person." Therefore, Strickland argues, "[n]one of these factors alone or in totality makes it reasonable to suspect that he was using drugs or driving while impaired by drugs."

¶41    Moreover, according to Strickland, "[t]he only remote indicia of drug use was the orange item on the floorboard that 'could be' a syringe cap." However, he explains that "[a]pproximately 9% of Americans are estimated to have diabetes"; "there is increased possession of these syringes for administering the COVID vaccine"; and "[a]lthough officers need not rule out the possibility of innocent behavior, inferences must still be reasonable, and an orange item that

'could' be a syringe cap is too speculative to amount to reasonable suspicion of possession of illegal drugs." *See Wiskowski*, 412 Wis. 2d 185, ¶13. Collectively, Strickland argues that "the most obvious inference is an innocuous one": "Strickland was awkward and his eyes were red because he was sleeping and it was 7:30 [a.m.]"

¶42 We reject Strickland's "divide-and-conquer analysis." *See State v. Genous*, 2021 WI 50, ¶12, 397 Wis. 2d 293, 961 N.W.2d 41 (citation omitted). We agree with the State's assessment that

> Strickland does a commendable job of noting each observation that coalesced to support reasonable suspicion, proffering innocent excuses for each observation when viewed in isolation, pointing out other damning observations that Officer Bonjean didn't make, and arguing that reasonable suspicion was lacking as a result. But that's not how the law works, and the supreme court made that clear when it previously rejected the "divide-and-conquer" tactic of "isolating various factors, attacking them one by one, and then excluding each factor from the totality-of-the-circumstances analysis."

*See id.* (citation omitted). Further, Strickland's arguments are precisely the type of arguments addressed by the "innocent explanation" rule that an officer is not *required* to accept. *See Hogan*, 364 Wis. 2d 167, ¶36; *see also State v. Kutz*, 2003 WI App 205, ¶12, 267 Wis. 2d 531, 671 N.W.2d 660 ("When a police officer is confronted with two reasonable competing inferences, one justifying arrest and the other not, the officer is entitled to rely on the reasonable inference justifying arrest."). We agree that "[i]t is the whole picture, evaluated together, that serves as the proper analytical framework," *see Genous*, 397 Wis. 2d 293, ¶12, and the facts in this case, viewed together, are not too speculative to meet the standard for reasonable suspicion.

**III. Act 79 search**

¶43 Finally, we will briefly address whether Bonjean lawfully conducted an Act 79 search on Strickland's vehicle. While the Fourth Amendment protects against unreasonable searches and seizures, ***Brown***, 392 Wis. 2d 454, ¶9, "what is unreasonable for a probationer differs from what is unreasonable for a law-abiding citizen," ***State v. Purtell***, 2014 WI 101, ¶22, 358 Wis. 2d 212, 851 N.W.2d 417. With that theory in mind, the Wisconsin Legislature enacted 2013 Wis. Act 79, which, among other things, allows law enforcement to search a probationer "on probation for a felony or for any violation of [WIS. STAT.] ch. 940, 948, or 961," his or her residence, and any property under his or her control "if the officer reasonably suspects that the person is committing, is about to commit, or has committed a crime or a violation of a condition of probation." WIS. STAT. § 973.09(1d). Thus, while "[g]enerally, a full search cannot be accomplished without a determination of probable cause," § 973.09(1d) "lowers the legal standard required for a law enforcement officer to perform a search." *See* ***Anderson***, 389 Wis. 2d 106, ¶23.[8]

¶44 Our supreme court has explained that the threshold inquiry to justify an Act 79 search is whether law enforcement had knowledge of an individual's probation status. *See* ***id.***, ¶21. The second inquiry is whether, under the totality of the circumstances, law enforcement had reasonable suspicion that the individual

---

[8] In ***State v. Anderson***, 2019 WI 97, ¶13 & n.6, ¶22, 389 Wis. 2d 106, 935 N.W.2d 285, our supreme court analyzed Act 79 as it relates to a person released on extended supervision for a felony offense, not probation. The court's analysis is applicable under both situations, however, because they are treated the same under Act 79. *Compare* WIS. STAT. § 973.09(1d), *with* WIS. STAT. § 302.113(7r).

was committing, was about to commit, or had committed a crime or a violation of a condition of probation. *See **id.***

¶45    Here, it is undisputed that Bonjean knew that Strickland was on probation for a felony. As Strickland explains, Bonjean "found out Mr. Strickland was on probation while he was seated in the car, but [Bonjean] did not learn he was on probation for a felony until he was questioning Mr. Strickland outside the car." Thus, the threshold inquiry has been met. *See **id.*** As to the second inquiry, Strickland correctly conceded in his reply brief that he "agrees with the State that Act 79 would authorize the search of Mr. Strickland's car if there was reasonable suspicion that Mr. Strickland was using illegal controlled substances and that evidence of such would be located in the car." Given that we determined above that Bonjean had reasonable suspicion that Strickland was committing, was about to commit, or had committed a crime once Strickland exited his vehicle, we conclude that Bonjean's Act 79 search of Strickland's vehicle was lawful. *See **id.***

*By the Court.*—Judgment affirmed.

Not recommended for publication in the official reports.

21